UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                 :

LSSI DATA CORP.,                        :

                                 :

                      Plaintiff,      :        11 Civ. 7780 (PAE)

              -v-                  :

                                 :        <u>OPINION & ORDER</u>

TIME WARNER CABLE, INC.,          :

                                 :

                      Defendant.    :

                                 :

------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Plaintiff LSSi Data Corp. ("LSSi") moves, pursuant to 47 U.S.C. §§ 202(a), 251(b)(3),

and 406, for a preliminary injunction compelling defendant Time Warner Cable, Inc. ("TWC") to

provide it with all directory assistance listing data for TWC's telephone subscribers.  For the

following reasons, LSSi's motion is denied.

**I.**      **Regulatory Background**

      LSSi's primary claim in this case is made under the Telecommunications Act of 1996,

Pub. L. No. 104-104, 110 Stat. 56 (1996) (the "TCA").  The provision on which LSSi relies, 47

U.S.C. § 251(b)(3), as interpreted by the Federal Communications Commission ("FCC"), entitles

certain telecommunications industry participants to access, under nondiscriminatory terms, the

directory assistance ("DA") listing data of industry participants known as "local exchange

carriers," or LECs.  TWC is, in many states, a LEC, and LSSi claims that it is entitled under §

251(b)(3) to TWC's DA data.  Alternatively, LSSi claims that it is entitled to the same data

under 47 U.S.C. § 202(a), a provision of the Communications Act of 1934 ("the

Communications Act"), 47 U.S.C. § 151 *et seq*., which prohibits a common carrier from

engaging in discriminatory practices "in connection with its provision of communications services."

Understanding the complex regulatory framework is imperative to understanding LSSi's claims and the parties' respective arguments.

The Communications Act put in place the initial framework for federal regulation of the telecommunications industry.  Enacted in response to the dominance of the telephone industry by American Telephone & Telegraph Company and its affiliates, the Communications Act gave the FCC broad authority to regulate interstate telephone service.  *See, e.g., Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 48 (2007); *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 235 (1994) (Stevens, J., dissenting).  The FCC, in turn,

> used this authority to develop a traditional regulatory system much like the systems other commissions had applied when regulating railroads, public utilities, and other common carriers.  A utility or carrier would file with a commission a tariff containing rates, and perhaps other practices, classifications, or regulations in connection with its provision of communications services.  The commission would examine the rates, etc., and, after appropriate proceedings, approve them, set them aside, or, sometimes, set forth a substitute rate schedule or list of approved charges, classifications, or practices that the carrier or utility must follow.

*Global Crossing Telecomms.*, 550 U.S. at 48.

The Communications Act also included provisions specifically aimed at "eliminat[ing] the use of monopolistic power to stifle competition."  *Law Offices of Curtis V. Trinko v. Bell Atl. Corp.*, 305 F.3d 89, 99 (2d Cir. 2002), *rev'd on other grounds by Verizon Commc'ns v. Trinko*, 540 U.S. 398 (2004);  *see also MCI Telecomms. Corp.,* 512 U.S. at 235.  One such provision, codified at 47 U.S.C. § 202(a), provides a remedy for market participants aggrieved by discriminatory practices of a common carrier.  Section 202(a) provides:

> It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or

[2]

> services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

*See, e.g.*, *Trinko*, 305 F.3d at 98–99; *National Commc'ns Ass'n, Inc. v. AT&T*, 238 F.3d 124, 127 (2d Cir. 2001); *Li Xi v. Apple Inc.*, 603 F. Supp. 2d 464, 471 (E.D.N.Y. 2009); *Net2Globe Int'l v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 460 (S.D.N.Y. 2003).  As noted, LSSi brings this suit based, in part, on § 202(a).

In 1996, Congress enacted the TCA, which dramatically altered the regulatory landscape. The TCA sought to move the telecommunications industry from an environment characterized by close regulation, a finite number of competitors, and high barriers to entry, to one marked by a "procompetitive, deregulatory national policy framework designed to accelerate rapid private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition."  S. Conf. Rep. No. 104-230, 104th Cong., 2d Sess. 1 (1996).

In implementing that policy, Congress recognized that a significant barrier to entry was presented by the fact that  incumbent local exchange carriers ("ILECs") tended to "own[] the local exchange networks[,] the physical equipment necessary to receive, properly route, and deliver phone calls among customers."  *Talk Am., Inc. v. Mich. Bell Tel. Co.*, 131 S. Ct. 2254, 2257–58 (2011) (citing *Verizon Commc'ns., Inc. v. FCC*, 535 U.S. 467, 490 (2002)).  Without congressional action, "a new, competitive LEC could not compete with an incumbent carrier without basically replicating the incumbent's entire existing network" at prohibitive cost.  *Talk Am., Inc.*, 131 S. Ct. at 2258.  To redress that competitive disadvantage, the TCA "imposed a number of duties on incumbent providers of local telephone service in order to facilitate market

[3]

entry by competitors." *Id.* at 2257.  Most relevant here, Congress "require[d] incumbent LECs to share their networks with competitive LECs." *Id.* at 2258.[1]

In enacting the TCA, Congress further recognized that "the competitive provision of directory assistance is a necessary element of a competitive local telecommunications market." *Provision of Directory Listings Information Under the Communications Act of 1934, as Amended, First Report and Order* (the "2001 Order"), 16 FCC Rcd. 2736, at ¶ 2 (2001).  As the FCC has explained, giving local exchange carriers access to local directory assistance data is vital to the goal of attaining robust competition in local telecommunications markets.  That is because, "[w]ithout nondiscriminatory access to the incumbents' directory assistance databases, competing DA providers may be unable to offer a competitive directory assistance product. This, in turn, may affect the ability of both DA providers and the [competing LECs] that rely on them to compete in the local exchange marketplace."  2001 Order, 16 FCC Rcd. 2736 at ¶ 3.

To achieve these ends, Congress enacted § 251(b)(3), which is central to this litigation.  It provides:

> (b) Obligations of all local exchange carriers. Each local exchange carrier has the following duties:
>  . . .
> (3) Dialing parity.  The duty to provide dialing parity to competing providers of telephone exchange service and telephone toll service, and the duty to permit all such providers to have nondiscriminatory access to telephone numbers, operator services, directory assistance, and directory listing, with no unreasonable dialing delays.

47 U.S.C. § 251(b)(3).

---

[1] These new requirements generated a wave of litigation and regulatory action as incumbent market participants sought to clarify their duties to new market entrants.  *See Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 533–34 (D.C. Cir. 2006) (summarizing the decade-long regulatory battle between ILECs and CLECs).

The TCA does not itself amplify on the standards by which an entity in the industry may

qualify as a "competing provider[] of telephone exchange service" under § 251(b)(3), so as to

require a LEC (hereinafter, the "providing LEC") to provide it with access to its DA data.

However, the FCC has addressed this issue, in a series of orders construing the TCA.  These

include the 2001 Order, *supra,* and *In the Matter of Implementation of the Telecommunications*

*Act of 1996:  Telecommunications Carriers' Use of Customer Proprietary Network Information*

*and Other Customer Information; Implementation of the Local Competition Provisions of the*

*Telecommunications Act of 1996; Provision of Directory Listing Information under the*

*Communications Act of 1934, as Amended* (the "2005 Order"), 20 FCC Rcd. 9334 (2005).

Specifically, the FCC has determined that three categories of market participants are

entitled under § 251(b)(3) to nondiscriminatory access to the DA data of a providing LEC:  (1) a

competing LEC, known as a "CLEC"; (2) an agent of a competing LEC who provides directory

assistance services for that CLEC; and (3) a competing provider of "call competition services."

2005 Order, 20 FCC Rcd. 9334, at ¶ 3; 2001 Order, 16 FCC Rcd. 2736, at ¶¶ 14, 22, 27–29.  In

its orders, the FCC has explained why affording these entities access to a providing LEC's DA

data vindicates the statute's text and procompetitive purpose.  The FCC has also elaborated on

the contours of the three categories.  Later in this opinion, the Court addresses each category in

detail, in the course of discussing LSSi's claims to fit within each.

## II.    Background to the Current Dispute[2]

---

[2]  The following account of the facts is drawn from the parties' submissions in connection with
LSSi's motion for a preliminary injunction.  These include: (1) LSSi's Supplemental Brief in
Support of its Motion for a Preliminary Injunction ("LSSi Supp. Br.") (Dkt. 72), along with the
accompanying Declaration of Bradley M. Davis ("Davis Decl.") (Dkt. 72-2) and attached
exhibits, including the Declaration of Richard Oldach ("Oldach Decl."), the Supplemental
Declaration of Richard Oldach ("Oldach Supp. Decl.") and the Second Supplemental Declaration
of Richard Oldach ("Oldach 2d Supp. Decl.") (Dkt. 72-12); (2) TWC's Supplemental Brief in

### A.      The Parties

The plaintiff, LSSi, is a subsidiary of VoltData Resources LLC ("Volt").  LSSi has

consistently held itself out as a data aggregator and seller—an entity that collects, combines, and

sells data relating to telephone subscribers.  LSSi Supp. Br. 1, 3.  As LSSi described itself to

another federal court:

> LSSi is an aggregator of data from all of the carriers in North American and in
> other countries.  What we do is we take direct feeds from the phone companies,
> we take all of those feeds and we combine them together to create a national
> directory assistance file.  We then use that file with our customers for a variety of
> directory assistance related purposes . . . we also provide the data for companies
> to do things like credit collections where you want to find out where somebody is
> located, we provide the data so they can look up people by name and address or
> name to find address information or name to find phone information.

*LSSi Data Corp. v. Comcast Phone, LCC*, Civil Action No. 1:11-cv-0124-CAP (N.D. Ga.), April

20, 2011 Hg. Tr., at 33 (Sherman Decl. Ex. 5).  LSSi's website similarly states, in a "Company

Overview," that LSSi:

> uniquely delivers the most current and accurate names, addresses, and phone
> numbers with associated detail as an enterprise-based vendor to source contact
> information directly from AND for major telecommunication providers . . . .

---

Opposition to LSSi's Motion for a Preliminary Injunction ("TWC Supp. Br.") (Dkt. 81), and the
accompanying Declaration of Paul G. Sherman ("Sherman Decl.") (Dkt. 87) with attached
exhibits, including the declarations of Stephen Minshew ("Minshew Decl."), Jason Loyer
("Loyer Decl."), Matthew Brill ("Brill Decl."), Todd Lewis ("Lewis Decl."), Dennis Ainge
("Ainge Decl."), and Paul G. Sherman ("Sherman 2d Decl."); (3) LSSi's Supplemental Reply in
Further Support of its Motion for a Preliminary Injunction ("LSSi. Supp. Rep.") (Dkt. 83), along
with the accompanying Third Declaration of Bradley M. Davis ("Davis 3d Decl.") (Dkt. 83-1),
the Second Declaration of Todd Lewis ("Lewis 2d Decl."); the initial and second declarations of
Ray Whitman ("Whitman Decl." and "Whitman 2d Decl."); and (4) the Third Supplemental
Declaration of Richard Oldach ("Oldach 3d Supp. Decl."), dated April 13, 2012, which served as
Oldach's direct testimony at the hearing on LSSi's motion held on April 19, 2012.  This Opinion
also draws upon Oldach's live testimony at the hearing (beginning with cross-examination), and
counsel's arguments there.  As used herein, "Hg. Tr." refers to the transcript of that hearing;
"Dep." refers to the deposition transcript of the person indicated; and "Interrog." or "Supp.
Interrog." refer, respectively, to the responses and supplemental responses to interrogatories by
the party indicated.

> Business, residential and government contacts are included in data resources measured in the hundreds of millions of records.

Oldach 3d Supp. Decl., Ex. 1 at LSSI 00004521.  And the website of LSSi's parent company, Volt, describes LSSi as performing:

> database-marketing services, data-processing, listing verification, and mobile and online data solutions to a variety of companies across a broad spectrum of industries, including telecommunications service providers and cable operators, credit and collections, direct marketers, and online and offline retail providers.

*Id.* at LSSI00004527.

The parties agree that a data aggregator and seller does not, without more, have a right to access a LEC's DA data under § 251(b)(3).  Rather, an entity has such rights only if it also fits into one or more of the categories of industry participants the FCC recognized in the 2001 Order.  *See* Hg. Tr. 161 (statement of LSSi's counsel).  Here, LSSi claims to fit into all three:  It claims to be (1) a LEC competing with TWC, (2) an agent providing directory assistance services for a LEC competing with TWC, and (3) a competing provider of qualifying "call competition services."  The central issue in this case is whether LSSi has substantiated these claims, by competent proof.

The defendant, TWC, is a telecommunications carrier.  Ans. ¶ 9.  It provides telephone services in 28 states.[3]  In many, including New York, TWC is state-certified as a LEC.

**B.      Factual Background**

This dispute has its origins in a 2010 negotiation in which LSSi sought, but ultimately failed, to acquire access to and unrestricted use of TWC's directory assistance data.

---

[3]  Those states are Alabama, Arizona, California, Colorado, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Maine, Massachusetts, Michigan, Missouri, Nebraska, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Texas, Virginia, Washington, West Virginia, and Wisconsin.  TWC Supp. Br. 13 n.8.

### 1.   TWC's Negotiations with LSSi and Others

In 2003, TWC introduced digital telephone service.  Minshew Decl. ¶ 2.  Until 2010, TWC provided its telephone customers with service by using the network facilities of Sprint Communications Co.  Loyer Decl. ¶ 2.  Sprint thus connected TWC's customers with customers of existing LECs in TWC's service areas.  *Id.*  Sprint was also solely responsible for providing DA listing data for TWC's customers to other directory assistance providers.  *Id.*

In 2010, TWC decided to transition to a new, "Go-It-Alone" business model, under which it would gradually cease using Sprint's network facilities to provide services to its customers, and would instead use its own.  *Id.* at ¶ 3.  TWC, however, lacked a directory assistance platform.  It also lacked the technical capability to access its customers' listing information in a format that could be made available to other directory assistance providers.  Minshew Decl. ¶ 4.  To address the latter situation, TWC initiated negotiations with vendors, seeking to retain a vendor or vendors who would (1) create a customer database for TWC, and (2) interact with outside directory assistance providers on TWC's behalf, including making TWC customers' data available to them.  *Id.* at ¶¶ 4–5.

One vendor that TWC approached was LSSi.  In March 2010, TWC approached LSSi to inquire whether LSSi could act as TWC's vendor, for the purpose of providing TWC's customers' DA data to other directory assistance providers.  *Id.*; Oldach Dep. 6 (Sherman Decl. Ex. 3).  Those negotiations broke down, however, when TWC insisted on maintaining control over the uses to which LSSi would put TWC customers' information.  In particular, TWC insisted on prohibiting LSSi from selling such data to telemarketers.  Loyer Decl. ¶ 6; Minshew Dep. 118–21, 126–27, 130–32.  LSSi did not agree to that restriction.  Loyer Decl. ¶ 6.

TWC then entered into discussions with a different company, Targus*info* ("Targus"), to act as TWC's vendor to distribute its customer data to directory assistance providers. Loyer Decl. ¶ 8. Unlike LSSi, Targus agreed not to sell TWC's customer data to telemarketers; to use that data only as TWC expressly permitted; and not to use TWC's customer data for its own purposes without TWC's express consent. *Id.* at ¶¶ 8, 10–11. TWC ultimately entered into an agreement with Targus that embodied those restrictions. *Id.* ¶¶ 9–10. Under that agreement, TWC "outsourced its subscriber listing and directory assistance data collection, management, and distribution functions to Targus." Minshew Decl. ¶ 6. Targus was given TWC's DA data; it took on responsibility for both aggregating TWC's data into a database formatted so as to be accessible by directory assistance providers, and managing that database. *Id.* ¶¶ 9–11; Loyer Decl. ¶¶ 8–10; *see also* Davis Decl., Ex. A. (reproducing TWC/Targus agreements).

TWC retained two other outside vendors to perform distinct roles relating to its customer data. It retained a company called Neustar to, *inter alia*, filter, process and convert TWC's raw customer data into a "data feed." Minshew Decl. ¶ 4. Neustar generates and delivers this data feed to Targus. *Id.* at ¶ 8. Targus, in turn, uses the data feed to create and augment the DA database for which it is responsible. *Id.* at ¶ 9.[4]

TWC also retained kgb USA ("KGB"). KGB's role is to provide directory assistance (*i.e.*, 411 service) on TWC's behalf, to TWC's digital phone customers. TWC determined that— much as it was more economical to outsource its data collection and distribution functions to Targus—it was more economical to outsource its directory assistance functions to KGB than to develop a directory assistance capability of its own. *Id.* ¶ 13. To enable KGB to provide such directory assistance, KGB entered into an agreement with Targus. *Id.* ¶ 14. Under the

---

[4] Neustar also assists TWC in providing directory information to local directory publishers. Minshew Decl. ¶¶ 4–5.

KGB/Targus agreement, Targus sells KGB access to TWC's subscriber listing and DA database, for the sole purpose of allowing KGB to provide directory assistance services. *Id.*; *see also* Ainge Decl. ¶¶ 6–7 (attesting, on Targus's behalf, that "TWC has agreed to allow Targus to provide TWC's subscriber listings and directory assistance data to [KGB] . . . KGB pays Targus for this information and agrees to use it only for its directory assistance business. KGB is prohibited from selling this information to any third parties, including telemarketers.").

### 2.    LSSi's Demand for TWC's Directory Assistance Listing Data

In June 2010, TWC notified LSSi that it had selected another vendor to provide directory assistance listing services for it. Loyer Decl. ¶ 9.

In September 2010, LSSi contacted TWC. LSSi demanded access to TWC subscribers' DA data. It claimed, for the first time, a legal right to such access under the Communications Act and the TCA. Loyer Decl. ¶¶ 7, 12; Hg. Tr. 104; LSSi Supp. Br. 7. TWC responded by informing LSSi that LSSi should direct its request for access to that database to Targus, because Targus is responsible for managing TWC's DA database and making it accessible to directory assistance providers. *See* Sept. 30, 2010 Loyer e-mail to LSSi (Sherman Decl. Ex. 21). LSSi did not, apparently, contact Targus.

In May 2011, LSSi again contacted TWC to demand its DA data. LSSi claimed a statutory right to receive such data, based on 47 U.S.C. § 251(b)(3). LSSi stated that it was (1) a competing LEC of TWC's, (2) an agent providing directory assistance services for a competing LEC of TWC's, and (3) a provider of qualifying "call competition services." LSSi Supp. Br. 14. LSSi also claimed that TWC was unlawfully discriminating against it, in violation of 47 U.S.C. § 202(a), by providing Targus, and not LSSi, direct access to TWC's database. TWC responded, through counsel, by demanding proof that LSSi did, in fact, have a right to such access under §

251(b)(3).  Brill Decl. ¶¶ 3–4 & Ex. 1; LSSi Supp. Br. 14; Davis Decl. Ex. F.  LSSi did not

supply TWC with any such proof.  Instead, after a series of email exchanges between counsel,

*see* Brill Decl. ¶¶ 4–5; Davis Decl. Ex. F, LSSi filed this lawsuit.

### C.    Procedural History

On July 5, 2011, LSSi filed a Complaint against TWC and a motion for a preliminary

injunction in the U.S. District Court for the Northern District of Georgia.  Dkt. 1–2.  LSSi's

Complaint sought a declaratory judgment, pursuant to 28 U.S.C. § 2201, that TWC had violated

§ 251(b)(3) of the TCA and § 202(a) of the Communications Act by refusing to provide its DA

data to LSSi on the same terms that it had provided that data to Targus, whom LSSi described as

its competitor, or on the same terms as TWC received such data itself.  Two months earlier, LSSi

had obtained a preliminary injunction from the same court in a lawsuit against a different LEC,

Comcast Phone, LLC ("Comcast"), in which LSSi had sought similar relief.  *See LSSi Data*

*Corp. v. Comcast Phone, LLC*, 785 F. Supp. 2d 1356 (N.D. Ga. 2011) ("the *Comcast* decision").

On August 16, 2011, LSSi's motion for a preliminary injunction in this case was fully

submitted.  Dkt. 19.

On November 1, 2011, the Hon. Charles A. Pannell, Jr., without addressing the merits,

granted TWC's motion to transfer this action to the Southern District of New York.  Dkt. 34.[5]

On November 16, 2011, by letter, TWC requested expedited discovery on LSSi's

preliminary injunction motion.  Dkt. 89.  On November 29, 2011, by letter, LSSi opposed that

application.  Dkt. 90.

---

[5]  Judge Pannell found that this District was more convenient for the parties and witnesses, that
none of the operative facts in the case had occurred in Georgia, and that whatever familiarity he
had with the governing law did not overcome other factors so as to merit retention of the case in
the Northern District of Georgia.  *See* Dkt. 34 at pp. 6–7, 9–10.

On December 7, 2011, the Court held an extended telephone conference with the parties to discuss TWC's request for expedited discovery on LSSi's motion.  Dkt. 51.  TWC stated that it disputed LSSi's claim of a statutory entitlement under 47 U.S.C. § 251(b)(3), in particular, that LSSi is (1) a competing LEC with respect to TWC, (2) the directory assistance agent of a LEC competing with TWC, or (3) a provider performing qualifying call completion services.  TWC argued, in essence, that although LSSi would like to access TWC's subscriber data so as to permit it to sell such data, including to telemarketers, LSSi has no statutory right to it.  To enable it to resolve this dispute, the Court authorized the taking of discovery on LSSi's motion.  The Court directed the parties to jointly develop a schedule for expedited discovery.

On December 13, 2011, the Court endorsed the parties' proposed schedule with respect to discovery and briefing.  Dkt. 52.  The schedule authorized each party to obtain document discovery and to take five depositions, on the topics of (1) LSSi's statutory entitlement to TWC's data, (2) the alleged harm to LSSi if an injunction were not granted, (3) the alleged harm to TWC and the public interest if an injunction were granted, and (4) LSSi's delay in bringing this lawsuit.  *Id.*

On January 27, 2012, at TWC's request, the Court extended the pre-motion fact discovery deadline from January 31, 2012 to February 14, 2012.  Dkt. 57.[6]

On February 28, 2012, LSSi submitted a supplemental memorandum of law and supporting materials in support of its motion.  These materials consisted of three declarations of fact from LSSi's President and Rule 30(b)(6) witness, Richard Oldach, and various supporting

---

[6]  Also in late January 2012, the parties sought the Court's intervention to resolve a number of discovery disputes, which were briefed by letter.  The Court resolved those disputes by Order dated January 31, 2012.  *See* Dkt. 58.

materials.[7]  On March 14, 2012, TWC filed an opposition, with supporting factual materials.[8]

On March 21, 2012, LSSi submitted its reply.[9]

On April 19, 2012, the Court held a hearing on LSSi's motion.[10]  At that hearing, the

Court heard testimony from Oldach, whom LSSi had designated as its corporate representative,

pursuant to Fed. R. Civ. P. 30(b)(6).  The Court also heard extended oral argument.

### D.    Summary of Arguments on LSSi's Preliminary Injunction Motion

#### 1.    LSSi's Arguments

LSSi argues that it is likely to succeed on the merits of its claim of entitlement to TWC's

data under 47 U.S.C. § 251(b)(3).  On this issue, LSSi urges the Court to look to Judge Pannell's

---

[7] The first two of Oldach's declarations had been submitted in support of LSSi's motion for a preliminary injunction while the case was pending in Georgia.  The third was new.  Together, these declarations attested generally to the nature of LSSi's business and to the harm LSSi would suffer without injunctive relief.  LSSi also submitted excerpts of deposition testimony, responses to interrogatories, documents produced in discovery, and copies of FCC orders.

[8] TWC submitted declarations from its employees Stephen Minshew and Jason Loyer, attesting to TWC's negotiations with LSSi, the nature of TWC's business, and TWC's agreement with Targus.  TWC also submitted declarations from Dennis Ainge, vice president of Targus, describing Targus's relationship with TWC, and Todd Lewis, assistance vice president of Frontier Communications Corporation.  TWC also submitted excerpts of deposition testimony, responses to interrogatories, and documents produced in discovery.

[9] Along with its reply, LSSi submitted several agreements between LSSi (and/or Volt) and third parties.  It also submitted an additional declaration from Lewis of Frontier, additional deposition excerpts, and additional FCC materials.

[10] On February 14, 2012, the day discovery closed, LSSi filed a motion to add its parent company, Volt, as a party plaintiff in this matter.  Dkt. 63.  On February 27, 2012, TWC served a response (Dkt. 74); on March 14, 2012, LSSi filed a reply (Dkt. 73).  In an Opinion and Order dated March 20, 2012, the Court denied LSSi's motion to add Volt, without prejudice to LSSi's right to move again to add Volt after LSSi's motion for a preliminary injunction was resolved. Dkt. 79.  As the Court explained, extensive pre-motion discovery had been completed based on LSSi's claim that it (not Volt) had a legal entitlement to TWC's data; TWC had justifiably relied, in conducting that discovery, on defending against LSSi's claim as pled; and Volt's claim of entitlement would raise new factual issues necessitating additional discovery and briefing.  *Id.*

*Comcast* decision for guidance, because that decision states that LSSi is a competing LEC, a provider of call completion services, and a directory assistance agent of a competing LEC.  In any event, LSSi argues, the evidence adduced in discovery in this case establishes that it fits within each of these three categories.  LSSi further argues that TWC is violating its duty to furnish access to its DA data on nondiscriminatory terms, principally because, it claims, its competitor, Targus, is receiving TWC's data on preferential terms.  For similar reasons, LSSi argues that TWC has violated 47 U.S.C. § 202(a), by engaging in discriminatory practices with respect to access to its DA data.

As to the other elements required to obtain a preliminary injunction, LSSi claims that it is suffering, and absent an injunction, will continue to suffer, irreparable harm.  It states that its inability to access TWC's DA data is inhibiting it from competing with Targus in the market for the sale of DA data.  LSSi also argues that Targus is unfairly exploiting its preferential access to TWC's data to gain other advantages in the marketplace.

### 2.    TWC's Arguments

TWC disputes LSSi's entitlement under all three § 251(b)(3) categories.  It argues that the evidence shows that:  (1) LSSi is a certified LEC in only three states, in none of which TWC is a LEC; thus, in no state is LSSi a LEC competing with TWC; (2) LSSi does not have an agency relationship with any LEC competing with TWC pursuant to which it provides that LEC with the directory assistance services sufficient to qualify for a right of access under the 2001 Order; and (3) LSSi does not conduct "call completion services" as defined by the FCC.  TWC also argues that no deference is due to the *Comcast* decision, because LSSi's claim in that case to be a "competing provider of telephone exchange service" under § 251(b)(3) was assumed to be true based on its pleadings, and was not litigated.  TWC also argues that, even if LSSi fit §

251(b)(3), TWC has not discriminated against it with respect to access to its DA data, because TWC has merely outsourced to Targus its responsibility for disseminating that data, and Targus is prohibited from using TWC's data for its own purposes. TWC also argues, as to § 202(a), that any competition between LSSi and Targus is in the market for the sale of customer data, with which § 202(a) is not concerned.

As to irreparable harm, TWC claims that LSSi has not been irreparably harmed because LSSi waited 10 months to file this lawsuit after learning (in September 2010) that TWC disputed its entitlement to TWC's DA data. TWC also argues that LSSi filed this suit when (and where) it did not because it was suffering irreparable harm, but to capitalize on its victory (now on appeal) in the *Comcast* litigation in the Northern District of Georgia.

## III.   Discussion

### A.        Standard for a Preliminary Injunction

A preliminary injunction

> is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.

*Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008)). A plaintiff seeking a preliminary injunction must normally "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Psihoyos v. John Wiley & Sons, Inc.*, 2011 U.S. Dist LEXIS 115835, at *3 (S.D.N.Y. Oct. 4, 2011) (citing *Winter*, 555 U.S. at 20 (2008)); *see also Reckitt Benckiser Inc. v. Motomco Ltd.*, 760 F. Supp. 2d 446, 451–52 (S.D.N.Y. 2011).

LSSi's burden in this case is heightened, because it seeks an "injunction that alters the status quo by commanding some positive act, as opposed to a prohibitory injunction seeking only to maintain the status quo."[11] *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (citing *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010)).  Under these circumstances, an injunction may "issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief."  *Cacchillo*, 638 F.3d at 406 (citing *Citigroup Global Mkts., Inc.*, 598 F.3d at 35 n.4).[12]

LSSi asserts that, given the nature of its claims, it need not show irreparable harm to gain injunctive relief.  LSSi cites *Mical Commc'ns, Inc. v. Sprint Telemedia, Inc.*, 1 F.3d 1031 (10th Cir. 1993) for the proposition that a plaintiff seeking a preliminary injunction premised on a statute which authorizes injunctive relief need not demonstrate irreparable harm.  LSSi Supp. Br. 23–24; *see also Bellingrath-Morse Found. v. Bellsouth Telecomm., Inc.*, 884 F. Supp. 472, 476 (S.D. Ala. 1995).  However, as LSSi acknowledges, the Second Circuit has not so held.  *See* LSSi Supp. Br. 24 n.14.  Rather, the Second Circuit has repeatedly emphasized that "[a] showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'"  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)

---

[11] LSSi concedes that its motion would alter the status quo.  *See* LSSi Supp. Br. 17.

[12]  LSSi's burden on this motion is also heightened because the motion seeks, effectively, the same relief as its Complaint, and such relief could not readily be undone.  The Complaint seeks a writ of mandamus, pursuant to 47 U.S.C. § 406, compelling TWC to turn over its DA data.  Thus, granting LSSi's motion, in which LSSi seeks immediate access to that data, would "provide [LSSi] with 'all the relief that is sought,'" and it is unclear that such relief could "be undone by a judgment favorable to defendants on the merits at trial."  *Citigroup Global Mkts., Inc.*, 598 F.3d at 35 n.4 (quoting *Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 (2d Cir. 2006)) (additional citation omitted).

[16]

(quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)); *see also Singas Famous Pizza Brands Corp. v. New York Adver. LLC*, No. 11-1038, 2012 U.S. App. LEXIS 6753, at *3 (2d Cir. Mar. 19, 2012) (slip op.) (summ. order); *Bisnews AFE (Thail.) Ltd. v. Aspen Research Group Ltd.*, 437 F. App'x 57, 58 (2d Cir. 2011) (summ. order); *Borey v. Nat'l Union Fire Insur. Co.*, 934 F.2d 30, 34 (2d Cir. 1991); *King v. Pine Plains Cent. Sch. Dist.*, 923 F. Supp. 541, 547 (S.D.N.Y. 1996).[13]  In light of this authority, and the absence of any contrary holding in this Circuit, the Court declines to relieve LSSi of the burden of showing irreparable harm.

The Second Circuit has "explained that '[t]o satisfy the irreparable harm requirement, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.'"  *Faiveley Transp.*, 559 F.3d at 118 (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)).  Thus, "'[w]here there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances.'"  *Faiveley Transp.*, 559 F.3d at 118 (quoting *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005)).

### B.    The *LSSi v. Comcast* Decision

At the outset, the Court addresses LSSi's reliance on the *Comcast* decision.  In its briefs and at argument, LSSi repeatedly cited that decision as, purportedly, establishing that LSSi is a "competing provider of telephone exchange service" entitled to the DA data of competing LECs

---

[13] Based on the Court's research, the Second Circuit has dispensed only once with the irreparable harm requirement in the context of the communications laws.  In *Prayze FM v. FCC*, 214 F.3d 245 (2d Cir. 2000), it relieved the government—which, enforcing broadcast licensing laws, had moved to enjoin a defendant from unlicensed broadcasting—from having to show irreparable harm.  The context presented by *Prayze FM* is clearly distinct from that here.

under each of the three § 251(b)(3) categories.  *See, e.g.*, LSSi Supp. Br. 1, 4, 17, 21; LSSi Supp.

Rep. 2, 11–15.  The Court disagrees.

> As LSSi correctly notes, the decision in *Comcast* begins by stating:

> LSSi is a certificated local exchange carrier and a provider of directory assistance services, call completion services, data aggregation services, and other services to telecommunications carriers throughout the United States [Doc. No. 1, page 2]. Comcast is a local exchange carrier as defined in the Communications Act of 1934, as amended, 47 U.S.C. § 153 [Id. page 3].

785 F. Supp. 2d at 1358.  However, on examination, the authority cited in *Comcast* as the basis

for describing LSSi as such—"Doc. No. 1, page 2"—is nothing more than LSSi's Complaint in

that case.[14]  LSSi's factual characterization of itself in a Complaint in another lawsuit—let alone

its claim in that lawsuit as to how the legal terms of art found in § 251(b)(3) apply to it—does

not merit any deference, and certainly not in this litigation.  *Cf. Am. Cancer Soc'y v. Cook*, No.

10-10989, 2012 U.S. App. LEXIS 5769, at *9 (5th Cir. Mar. 20, 2012) (slip op.) ("[A] complaint

'is not evidence of the charges contained in it.'") (quoting *Scholes v. Lehmann*, 56 F.3d 750, 762

(7th Cir. 1995)); *see also FDIC v. Deglau*, 207 F.3d 153, 172 (3d Cir. 2000); *SEC v. Citigroup*

*Global Mkts. Inc.*, No. 11-cv-7387, 2011 U.S. Dist. LEXIS 135914, at *13 (S.D.N.Y. Nov. 28,

2011) ("As a matter of law, an allegation that is neither admitted nor denied is simply that, an

allegation.  It has no evidentiary value and no collateral estoppel effect."); *Tavarez v. Naugatuck*

*Bd. of Educ.*, No. 08-cv-725, 2012 U.S. Dist. LEXIS 57757, at *14 (D. Conn. Apr. 25, 2012)

("[A]llegations in a complaint are not evidence"); *Welch-Rubin v. Sandals Corp.*, No. 03-cv-481,

2004 U.S. Dist. LEXIS 22112, at *4 (D. Conn. Oct. 20, 2004) (same).

---

[14] LSSi's Complaint in that case, which this Court has reviewed, is docketed as "Document 1" in that litigation, No. 11-cv-1246-CAP (N.D. Ga. 2011).  That Complaint was verified by LSSi's President, Richard Oldach.

[18]

Moreover, based on this Court's review of the record in *Comcast*, it is clear that LSSi's status under § 251(b)(3) was simply not at issue in that case. The *Comcast* decision arose from LSSi's application for a temporary restraining order. The district court resolved that application in an accelerated proceeding, without discovery being taken. In deciding on LSSi's motion, the District Court took as true the allegations in LSSi's Complaint. Comcast, for its part, opposed LSSi's TRO application on other grounds. As to the likelihood of success on the merits, Comcast argued that it was not providing discriminatory access to its listing data; it also disputed that LSSi stood to suffer irreparable harm, that the harm to LSSi outweighed the injury to itself from granting a TRO, and that a TRO was in the public interest. 785 F. Supp. 2d at 1360–61. For reasons that are not apparent on the record, however, Comcast either did not, or could not, challenge, on LSSi's TRO application, LSSi's claim of entitlement to non-discriminatory access to its data under § 251(b)(3). Nor did the district court raise that issue *sua sponte*.

Under these circumstances, the district court's characterization of LSSi in the *Comcast* decision, which appears to have been an artifact of the expedited manner in which LSSi's request for emergency relief in that case was litigated and resolved, simply is not persuasive authority and does not merit deference here.[15]

By contrast, in this case, TWC promptly alerted this Court that, as a factual matter, it vigorously disputed LSSi's claim of entitlement under § 251(b)(3) to its DA data. From the

---

[15] Even if this were not the case, TWC was not a party to the *Comcast* litigation, and has a right not to be bound by any determination there of LSSi's statutory rights. *See, e.g.*, *Wickham Contracting Co. v. Bd. of Educ.*, 715 F.2d 21, 28 (2d Cir. 1983) (limitations on doctrine of issue preclusion are "necessary in the name of procedural fairness, if not due process itself, so that parties to litigation have sufficient notice and incentive to litigate matters in earlier proceedings which may bind them in subsequent matters") (internal quotation marks and citation omitted); *Am. Std., Inc. v. Oakfabco, Inc.*, 498 F. Supp. 2d 711, 716 (S.D.N.Y. 2007) ("due process does not permit application of collateral estoppel against a party who did not have a full and fair opportunity to litigate the issue in the earlier proceeding").

outset, TWC argued here that LSSi is not a "competing provider of telephone exchange service," as defined in § 251(b)(3), but merely a "data aggregator" and seller that lacks data access rights under § 251(b)(3).  *See* TWC's Orig. Opp. to LSSi's Mot. for Prelim. Inj. (Dkt. 12 at 1–2, 14–23).  It was to resolve this potentially decisive area of dispute that this Court put in place a plan for expedited discovery.[16]

C.     **LSSi's Claim of Entitlement to TWC's DA Listing Data Under § 251(b)(3)**

The threshold issue in this case is whether LSSi has established that it fits within any of the three categories under § 251(b)(3) that would entitle it to non-discriminatory access to TWC's DA listings.  The Court addresses these categories in turn.

1.     **Is LSSi a "Competing Local Exchange Carrier"?**

LSSi claims, first, to be a competing local exchange carrier of TWC's.  *See* Compl. ¶ 8; LSSi Supp. Br. 3, 18–19.  A LEC is required to give competing LECs non-discriminatory access to its DA data.  This means that the providing LEC must both treat all such competitors equally and "provide such competing providers with access to [directory assistance data] equal to that which the LECs provide to themselves."  2005 Order, 20 FCC Rcd. 9334, at ¶ 2; *see also* 2001 Order, 16 FCC Rcd. 2736, at ¶ 14; *In the Matters of Implementation of the Local Competition*

---

[16] Another distinction from the *Comcast* litigation is that LSSi's preliminary injunction motion here is subject to a stricter standard.  LSSi sued Comcast after Comcast sought to terminate an existing agreement with LSSi under which Comcast had provided its listing data to LSSi, in favor of an exclusive relationship with Targus.  *See Comcast,* 785 F. Supp. 2d at 1358.  Because in the *Comcast* litigation LSSi was attempting to maintain, not alter, the status quo, it faced a lesser burden than here in seeking preliminary relief.  *See Cacchillo*, 638 F.3d at 406 (citing *Citigroup Global Mkts., Inc.*, 598 F.3d at 35 n.4).  LSSi's existing contractual right to the data in question in *Comcast* also supplied an argument as to irreparable harm not present here.  In granting TWC's motion to transfer this case, Judge Pannell identified this difference between the two cases as a reason not to retain this case in his Court.  *See* Dkt. 34 at 9 ("It is not clear that there is such a degree of identicality, especially considering that LSSi had a previous contractual relationship with Comcast to provide the data in question, but none with TWC.").

*Provisions of the Telecommunications Act of 1996; Interconnection Between Local Exchange Carriers and Commercial Mobile Radio Service Providers; Area Code Relief Plan for Dallas and Houston, Ordered by the Public Utility Commission of Texas; Administration of the North American Numbering Plan; Proposed 708 Relief Plan and 630 Numbering Plan Area Code by Ameritech-Illinois* (the "1996 Order"), 11 FCC Rcd. 19392, at ¶ 12 (1996).

The Court first considers whether LSSi qualifies as a LEC, and if so, where.  LSSi claims to be certified as a LEC in three states—Oregon, Utah, and Washington.  *See* Compl. ¶¶ 8, 14; Oldach 2d Supp. Decl. ¶ 3; Dkt. 19-1 Ex. A.  LSSi has substantiated this claim by producing certificates issued by the appropriate state commissions in these states attesting to its certification there.  Oldach Supp. Decl., Ex. A.

TWC counters that LSSi does not actually provide such services in these three states, but merely holds regulatory authority to do so.  TWC Supp. Br. 10, 13.  This claim appears to be correct.  LSSi's website describes itself as a "*non-carrier* data provider," and "the only Tier 1 supplier of contact information sourced directly from carriers that is NOT a telecommunication provider."  *See* http://www.lssidata.com/data-services.html; http://www.lssidata.com/whylssidata /quic.html (both last visited April 13, 2012) (italics added, capitalization in original).  And LSSi has not claimed in this litigation actually to function as a LEC in these states.

However, LSSi's lack of actual provision of exchange service as a LEC is not determinative of the issue here.  The FCC has explained that under § 251(b)(3):

> [a]ny entity that is certified as a competing LEC by the appropriate state commission is presumptively a competing provider of telephone exchange service . . . . If an incumbent LEC believes a particular certified CLEC is not actually providing or planning to provide telephone exchange service to consumers, the incumbent may challenge the certification before the appropriate state commission.  However, as long as the state certification remains in effect, the incumbent must provide the CLEC with nondiscriminatory database access and the other resources to which a CLEC is entitled under section 251.

2001 Order, 16 FCC Rcd. 2736, at ¶ 14.  TWC concedes that it has not challenged LSSi's LEC

status in any of the three states in which LSSi is certified.  Accordingly, the Court finds that LSSi

is, for purposes of this litigation, a LEC in Oregon, Utah, and Washington.

The Court next turns to the issue of whether LSSi is a *competing* LEC of TWC's.  TWC

represents, and LSSi does not dispute, that TWC does not offer any services in Oregon or Utah.

TWC Supp. Br. 13 n.7.  LSSi is, therefore, not a competing LEC of TWC's in those two states.

As to Washington State, TWC acknowledges that it offers Voice over Internet Protocol

("VoIP") services in that state.  However, TWC argues that such services do not make it a LEC.

The First Circuit has explained the difference between these services:

> VoIP refers to calls routed in whole or in part over the internet rather than over
> traditional telephone lines.  VoIP users can place telephone calls from their
> computers to, and receive calls from, other computers or regular telephones, or
> can place calls through VoIP-connected telephones. Although the calls are routed
> through the internet for the VoIP user, calls going to or originating from
> traditional telephone users are switched through local exchange carriers, creating
> a substantial set of interconnection issues.

*Centennial Puerto Rico License Corp. v. Telecomms. Reg. Bd. of Puerto Rico*, 634 F.3d 17, 24

(1st Cir. 2011).

Whether providing VoIP services renders an entity a LEC, and therefore subject to the

requirements that the TCA imposes on LECs, presents a complex, important, and unresolved

question.  A LEC is defined, for purposes of the Act, as an entity "engaged in the provision of

telephone exchange service or exchange access."  47 U.S.C. § 153(32).  "Telephone exchange

service," in turn, is defined as:

> (A) service within a telephone exchange, or within a connected system of
> telephone exchanges within the same exchange area operated to furnish to
> subscribers intercommunicating service of the character ordinarily furnished by a
> single exchange, and which is covered by the exchange service charge, or (B)
> comparable service provided through a system of switches, transmission

equipment, or other facilities (or combination thereof) by which a subscriber can originate and terminate a telecommunications service.

47 U.S.C. § 153(54).[17]

The FCC has initiated a rulemaking process aimed at the classification of VoIP services and resolving whether VoIP services allow subscribers "to originate and terminate telecommunications service[s]." *See IP-Enabled Services, Notice of Proposed Rulemaking*, 19 FCC Rcd. 4863, at ¶¶ 42–44 (2004) (seeking public comment on the issues of "Which classes of IP-enabled services, if any, are 'telecommunications services' under the Act?  Which, if any, are 'information services'?").  The resolution of that issue will augur "significantly for VoIP's future," because "[i]f classified as a telecommunications service, VoIP would be subject to mandatory Title II common carrier regulations . . . but as an information service it would not." *Vonage Holdings Corp. v. FCC*, 489 F.3d 1232, 1235 (D.C. Cir. 2007).

The FCC has several times deferred resolving this question with finality, such that the state of play today is that the FCC has "not yet classified interconnected VoIP services as 'telecommunications services' . . . under the definitions of the Act."  *In the Matter of Universal Service Contribution Methodology*, 21 FCC Rcd. 7518, at ¶ 35 (2006); *see also In the Matter of Connect America Fund*, 26 FCC Rcd. 17663, at ¶ 718 (2011) ("the Commission has not classified interconnected VoIP services as 'telecommunications services' or 'information services'"); *In re Sch. & Libraries Universal Serv. Support Mechanism*, 25 FCC Rcd. 6562, at ¶ 12 (2009); *IP-Enabled Services, Notice of Proposed Rulemaking*, 19 FCC Rcd. 4863, at ¶¶ 43–44 (2004).

---

[17] An entity may also qualify as a LEC by virtue of "offering . . . access to telephone exchange services or facilities for the purpose of the origination or termination of telephone toll services." 47 U.S.C. § 153(20).  That provision is not at issue here.

[23]

Because the FCC has repeatedly declined to hold that providing VoIP services renders an entity a LEC, the Court also declines to so hold. The FCC may yet so hold (or Congress may so legislate). But it is not for this Court to encroach on areas of regulatory expertise—or to short-circuit an ongoing rulemaking process aimed at resolving this question—by prematurely declaring the Act's carrier restrictions applicable to VoIP providers such as TWC. As the First Circuit noted in declining to interject itself into the "classification and regulation of VoIP traffic":

> VoIP presents a number of sensitive technical and policy considerations better left to the FCC and state commissions. Some VoIP calls originate on a computer and terminate at a telephone, or vice versa. Other VoIP calls, however, both originate and terminate on an actual telephone; for this type of call, the internet provides the medium of transmission on at least one end of the conversation. There are obvious differences between these types of calls. The FCC may choose to treat each configuration in a different way; conversely, it may choose to treat them in the same way, or not to regulate them at all.

*Centennial Puerto Rico License Corp.*, 634 F.3d at 38. This Court is also not the proper forum to evaluate these "sensitive technical and policy considerations."[18] Accordingly, based on the FCC's treatment of the VoIP issue to date, the Court finds that TWC does not presently function

---

[18] Under the doctrine of primary jurisdiction, "a federal court may refer a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight." *Nat'l Commc'ns Ass'n v. AT&T*, 46 F.3d 220, 223 (2d Cir. 1995) (quoting *Far East Conference v. United States*, 342 U.S. 570, 574 (1952)). "[C]ourts apply primary jurisdiction to cases involving technical and intricate questions of fact and policy that Congress has assigned to a specific agency." *Nat'l Commc'ns Ass'n*, 46 F.3d at 223 (citing *Goya Foods, Inc. v. Tropicana Products, Inc.*, 846 F.2d 848, 851 (2d Cir. 1988)); *see also Ellis v. Tribune TV Co.*, 443 F.3d 71, 82–85 (2d Cir. 2006); *MCI Commc'ns Corp. v. AT&T Co.*, 496 F.2d 214, 220 (3d Cir. 1974) ("a court should refer a matter to an administrative agency for resolution, even if the matter is otherwise properly before the court, if it appears that the matter involves technical or policy considerations which are beyond the court's ordinary competence and within the agency's particular field of expertise"). In the event the discrete question of the proper classification of VoIP services persists in this case, the Court will entertain an application to refer it to the FCC under the doctrine of primary jurisdiction.

[24]

as a LEC in Washington, and, therefore, that LSSi is not likely to prevail on its claim to be a competing LEC of TWC's in Washington and thereby entitled to TWC's local DA data there.

TWC separately argues that, even if an entity's provision of VoIP services could make it a LEC, the particular manner in which it renders such services in Washington precludes a finding that it is a LEC there. TWC represents that it still utilizes Sprint, a LEC in Washington, to connect its VoIP customers there to other customers, much as it had used Sprint nationally for that purpose until 2010. Accordingly, TWC argues, to the extent LSSi could be said to be competing with a LEC in Washington, that LEC would be Sprint, not TWC. TWC Supp. Br. 13–14; *see also* TWC Interrog. Resp. 18–19 (listing all markets where TWC or an affiliate serves as a LEC; Washington not listed). LSSi has not disputed TWC's claim as to the roles played in Washington by TWC and Sprint. Nor has LSSi addressed TWC's legal argument that if either entity serves as a LEC in Washington, it is Sprint, not TWC. The Court thus is constrained to conclude, on LSSi's motion for a preliminary injunction, that LSSi has failed to carry its burden as to this point, *i.e.*, to show that—even assuming that the provision of VoIP services were subject to § 251(b)(3)—TWC's activities in Washington would make it a LEC.

In a final argument on this point, LSSi argues that two LECs need not provide services in the same geographic market in order for one to qualify as a competing LEC entitled to non-discriminatory access to the other's directory assistance listing data. LSSi Supp. Rep. 2–3. For this argument, LSSi relies on 47 C.F.R. § 51.217(a)(1), which defines a "competing provider" as a "competing provider of telephone exchange service . . . that seeks nondiscriminatory access from a local exchange carrier (LEC) in that LEC's service area." LSSi argues that § 51.217(a)(1) means that a LEC in *any* market is a competing provider by virtue of merely *seeking* nondiscriminatory access to another LEC's data. Under this reading, as LSSi acknowledged at

argument, its status as a LEC in Oregon alone would entitle it to access to the DA data for TWC's New York subscribers, and indeed for all subscribers in any state, and a LEC certified in Alaska alone would be entitled to the DA data of a LEC in Maine, and indeed of all LECs, simply by virtue of seeking such data. *See* Hg. Tr. 128 (arguing that a CLEC "in Alaska only" is "entitled to the local listings from every CLEC in the United States as to all 50 states"). LSSi has not provided any other authority for this expansive claim, whether in the form of legislative history, FCC guidance, or case law.

The Court rejects LSSi's argument. It is inconsistent with the plain language of § 251(b)(3). Section 251(b)(3) does not impose a duty on all LECs to share data with any other LEC, wherever situated. Rather, the statute imposes a duty on "*local* exchange carriers" to provide dialing parity to "*competing* providers of telephone exchange service." LSSi's construction of the statute would effectively read the terms "local" and "competing" out of the statute, because in no logical sense is a *local* exchange carrier in Oregon *competing* with a *local* exchange carrier in New York. *See United States v. Aleynikov*, No. 11-1126, ___ F.3d ___, 2012 U.S. App. LEXIS 7439, at *23–24 (2d Cir. Apr. 11, 2012) (slip op.) ("'one of the most basic interpretive canons, [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant'") (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)). The regulation on which LSSi relies—47 C.F.R. § 51.217—does not assist LSSi, either. Quite the contrary: § 51.217 incorporates both statutory terms, "competing" and "local," in addressing the duty of LECs to make listing data available to competing providers of telephone exchange services. *See also* 2001 Order, 16 FCC Rcd. 2736, at ¶ 6 (requiring LECs to share directory assistance databases "with *their competitors*") (emphasis added).

[26]

For the foregoing reasons, the Court concludes that LSSi has failed to carry its burden to demonstrate, let alone clearly, that it and TWC are "competing providers" of local exchange services in any of the three states in which LSSi is certified as a LEC.

### 2.   Is LSSi an Agent Which Provides Directory Assistance Services on Behalf of a Competing Local Exchange Carrier?

LSSi also claims it is entitled to access TWC's DA data on the ground that it is the agent of a competing LEC of TWC's which provides directory assistance services to that CLEC.  *See* LSSi Supp. Br. 18–19; *see generally* 2005 Order, 20 FCC Rcd. 9334, at ¶ 3; 2001 Order, 16 FCC Rcd. 2736, at ¶¶ 26–29.

### a.   The FCC's guidance

In the 2001 and 2005 Orders, the FCC explained its basis for construing § 251(b)(3) to give data access rights to the agent of a competing LEC which provides directory assistance services to that CLEC.  2001 Order, 16 FCC Rcd. 2736, at ¶ 2.  The FCC reasoned that competing LECs "may not have the economies of scale to construct and maintain directory assistance platforms of their own."  *Id.*  Rather, in many instances, such CLECs have contracted with directory assistance providers "to serve as [the CLEC's] agents for the provision of directory assistance service."  *Id.*  These agency contracts "significantly aid the development of competition in the local exchange market," by sparing the CLEC from having to choose whether "to go to the substantial expense of maintaining their own database" or purchase it from the incumbent LEC.  *Id.* at ¶ 27.  Accordingly, "when a CLEC . . . designates a [directory assistance] provider to act as their agent, that competing DA provider is entitled to nondiscriminatory access to the providing LECs' local DA database."  *Id.*  In such situations, the FCC has stated, it "expect[s] that a DA provider's request for access will be accompanied by a letter or other

documentation from the CLEC . . . evidencing its intent that the DA provider receive database access so that it may fulfill its obligations to the CLEC." *Id.*[19]

### b. Evidence presented by the parties

Notwithstanding the FCC's admonition in the 2001 Order, LSSi did not accompany its demand to TWC for access with "a letter or other documentation"—or any other evidence—from a competing LEC "evidencing its intent that [LSSi] receive database access so that it may fulfill its obligations to the CLEC." After LSSi's May 2011 demand, TWC, citing the 2001 Order, requested such evidence from LSSi. *See* Brill Decl. ¶¶ 3, 6–7 (reproducing TWC counsel's June 17, 2011 e-mail to LSSi). LSSi did not provide such proof. Nor did it even identify the name of the CLEC whom it claimed to serve as an agent. *See id.* ¶ 5; Hg. Tr. 160. Instead, LSSi brought this lawsuit.

The first time in this litigation that LSSi identified the LECs for which it claimed to serve as a directory assistance agent was in an August 15, 2011 declaration from its President, Oldach. *See* Oldach Supp. Decl. ¶¶ 4–5. That declaration was submitted in support of LSSi's motion for a preliminary injunction. There, Oldach stated that "LSSi and its parent, VoltDelta Resources, LLC ('VoltDelta'), act together as agent to numerous LECs including, among others, AT&T, Verizon, Frontier, and ITC Deltacom." *Id.* at ¶ 4. Attached to Oldach's declaration were two letters. One, from Sharon Kendall, a senior contract manager at AT&T Services, Inc., and dated

---

[19] The FCC has clarified that, to satisfy § 251(b)(3), the relationship between the directory assistance provider and the LEC need not formally qualify under state law that of an agent and principal. *See id.* at ¶ 27 n.73 ("Where a DA provider is not under the supervision and control of the carrier-principal, the applicable state law may deem it to be an independent contractor rather than an agent. But for purposes of our analysis, the agency/independent contractor distinction is not relevant and we use the term 'agent' to encompass both types of relationships." In both circumstances, the rights of the DA provider are derivative of the rights of its carrier-principal."). Accordingly, the Court uses the term "agent" herein to embrace independent contractors as well as formal agents under state law.

August 2, 2011, stated:  "AT&T does have an agreement with VoltDelta to provide access to VoltDelta's national database for the provisioning of directory assistance services"; the other, from Todd B. Lewis, assistant vice president for network communications at Frontier Communications Corp. and dated July 25, 2011, stated, in parallel language to Kendall's: "Frontier does have an agreement with VoltDelta to provide access to VoltDelta's national database for the provisioning of directory assistance by Frontier to its customers."  *See id.* Ex. B. LSSi did not submit, then or later, letters from personnel at either Verizon or ITC Deltacom.[20]

After the case was transferred to this District, discovery commenced as to LSSi's entitlement under § 251(b)(3), and TWC challenged the letters from AT&T and Frontier.  TWC argued, *inter alia*, that the letters described the LECs' relationships with *Volt*, not LSSi.  *See* Dkt. 79 at 7–8.  To address this shortcoming, LSSi submitted, along with its opening brief, another pair of parallel-worded letters from AT&T and Frontier.  *See* Oldach 2d Supp. Decl. ¶¶ 3–4 & Exs. A, B.  In those letters, dated January 20, 2012 and February 1, 2012, respectively, AT&T's Kendall and Frontier's Lewis each stated that "LSSi Data Corp. and VoltDelta Resources, LLC work interchangeably in providing the services described" in their earlier letters.  *Id. at* Exs. A, B.

For its part, TWC, with its opposition brief, submitted materials responding to LSSi's evidence.  First, it offered a sworn declaration from Lewis, of Frontier.  Lewis stated that Frontier "has performed a nationwide search, has located no contracts between Frontier and LSSi

---

[20] In its responses to interrogatories, LSSi provided a longer list of entities for whom it serves as an agent.  It stated that it "operates as an agent or contractor through contracts with the following LECs:  AT&T, Verizon, Frontier, ITC Deltacom, Qwest, KGB, and Fairpoint."  LSSi Interrog. Resps. at 7–8.  LSSi has not produced "a letter or other documentation evidencing its intent that the DA provider receive database access"—or any other evidence supporting its claim—from Qwest, KGB, or Fairpoint.

Data Corp."; "Frontier has no formal agency agreement with LSSi or VoltDelta Resources, LCC"; and "[f]or its provision of directory assistance ('DA') services to its customers, Frontier provides its own operators and uses its own network facilities to connect DA calls."  Lewis Decl. ¶¶ 2–4.  He added that "Frontier has a contractual relationship with VoltDelta whereby VoltDelta provides Frontier with access to DA data (the 'Database Services')"; "[f]or these Database services, Frontier is billed by VoltDelta, not LSSi"; and "Frontier only makes payment to VoltDelta, not LSSi."  *Id.* at ¶¶ 6–8.  Lewis also stated:  "I do not have any specialized knowledge of the corporate relationship, if any, between VoltDelta and LSSi.  The statements made in my February 1, 2012 letter . . . are based solely on information provided to me by [a Volt employee, Nelson W.] Cain."  *Id.* at ¶ 9.  As to AT&T, TWC furnished a copy of AT&T's written agreement, which is with Volt, and not LSSi, *see* TWC Br. 22 (citing Sherman Decl. Ex. 15), and a declaration attesting that LSSi's document production revealed invoices from Volt to AT&T, but none from LSSi to AT&T.  Sherman 2d Decl. ¶ 9.

Along with its reply brief, LSSi submitted its own declaration from Lewis, of Frontier, dated March 21, 2012.  Lewis stated that, notwithstanding his earlier declaration, he is "aware that LSSi and VoltDelta do in fact act as the agents and contractors to Frontier for the purpose of obtaining directory assistance listing data from numerous carriers."  Lewis 2d Decl. ¶ 5.  He added that, although Frontier is billed by VoltData, not LSSi, he did not "mean to imply that LSSi does not perform the services for which such billing and payments are made."  *Id.* ¶ 9.  LSSi also submitted two declarations from an AT&T official, Ray Whitman, describing the functions and equipment that "VoltData and its subsidiaries" provide to AT&T in connection with AT&T's provision of directory assistance.  Whitman Decl. ¶ 4; Whitman 2d Decl. ¶ 6.

### c.  Analysis

Based on the evidence presented on its motion, LSSi's claim to serve as a directory assistance agent of a LEC competing with TWC within the meaning of § 251(b)(3) turns, at this stage, on whether it is such an agent of AT&T or Frontier.  As to the other LECs for whom LSSi has claimed to serve as such an agent, *see supra* note 20, LSSi simply did not come forward with any evidence to substantiate this claim.  LSSi did not present the "letter or other documentation" recommended by the FCC.  *See* Hg. Tr. 149 (statement of LSSi's counsel, that he was unable to explain absence of a letter from the ITC, and that Verizon "could not get the mechanics in time for the filing.  And I don't know why.").  Nor did LSSi present business records that might have substantiated such an agency role.  Such evidence might have included, for example, invoices, bills, or receipts for services provided by LSSi to the CLEC; agreements; or written communications between the parties.  With the preliminary injunction record barren of any such proof, the Court cannot find in LSSi's favor as to these entities, based on its uncorroborated say-so.

As to LSSi's claim of an agency role with respect to AT&T and Frontier—which the parties have vigorously litigated—LSSi's claim presents two issues.  The first is whether it is LSSi or its parent, Volt, that serves as agent to that competing LEC.  That issue matters because LSSi is the sole plaintiff in this case, and discovery on LSSi's motion was premised solely on the claim that LSSi had a statutory right to TWC's DA data.  LSSi moved after the close of discovery to add Volt as a plaintiff, but the Court denied that motion, without prejudice to LSSi's right to seek to add Volt after the motion is resolved.  *See supra* note 10; Dkt. 79.  The second

issue is whether LSSi's agency role with respect to each CLEC's directory assistance function is of the nature contemplated by the FCC in the 2001 Order.[21]

On the record before it, LSSi has not carried its burden as to either point. First, as to both AT&T and Frontier, the evidence is, at best for LSSi, ambiguous whether it is LSSi (as opposed to Volt) that serves as agent to the LEC. Volt is the only signatory to the agreements with AT&T and Frontier. *See* Lewis Decl. ¶ 6; Sherman Decl. Ex. 15; Hg. Tr. 16 (master agreement with AT&T is with Volt, not LSSi). It is, also, undisputed that Volt, and not LSSi, invoices AT&T and Frontier for the services it provides. *See* Sherman 2d Decl. ¶¶ 8–9; Lewis Decl. ¶¶ 6–7. The letters from AT&T's Kendall and Frontier's Lewis stating, in conclusory fashion, that LSSi and Volt "work interchangeably" in providing them services are unconvincing. Neither letter explains why the writer has personal knowledge of that fact. Indeed, Lewis, in a later declaration, admitted the opposite: he attested that he lacks knowledge as to the "corporate relationship" of Volt and LSSi, and that a Volt employee, Nelson Cain, had been the source of his claim that LSSi and Volt "work interchangeably" with respect to Frontier. *See* Lewis Decl. ¶ 9.[22] LSSi thus falls short of demonstrating, that, to the extent an agency relationship exists with AT&T and Frontier, LSSi (as opposed to Volt) is party to that relationship.

---

[21] Substantial evidence was presented that both AT&T and Frontier have large footprints as LECs, serving as such in multiple states, including a number of states in which TWC provides telephone services. The Court, therefore, assumes *arguendo* that these entities are "competing" with TWC.

[22] Ray Whitman, the AT&T affiant whose declarations LSSi introduced on its reply brief, was no more helpful to LSSi on this point. *See* Whitman Decl. ¶ 6 (AT&T has contractual relationship with VoltDelta); Whitman 2d Decl. ¶ 6 (stating that services are provided to AT&T by "VoltDelta and its subsidiaries").

Far more important, LSSi has failed thus far to establish that the services that it (or Volt)[23] provides to AT&T and Frontier are of the nature that the FCC contemplated in the 2001 Order. The letters from AT&T and Frontier state only that LSSi provides them access to *its* database in connection with those LECs' *own* provision of directory assistance services to *their own* subscribers. *See* Oldach 2d Supp. Decl. Exs. A, B; *see also* TWC Supp. Br. 22. In other words, the letters indicate that, under their respective arrangements with LSSi, both AT&T and Frontier remain responsible for providing directory assistance to their customers. The letters do not suggest that these two LECs have assigned, or delegated, to LSSi responsibility to provide directory assistance in their stead, or anything close. Rather, AT&T and Frontier appear to have retained LSSi to assist them in a far more limited capacity, largely involving selling customer listing data to these LECs.

The conclusion that LSSi provides support services only is reinforced, as to AT&T, by the two declarations that LSSi supplied from Whitman, along with its reply brief. He stated that AT&T "provides its own operators and uses its own network facilities to connect DA calls," Whitman Decl. ¶ 4, but is assisted by "VoltDelta and its subsidiaries," which provide "directory assistance listing services and products . . . a database search engine, workstations, functions that enable interactive voice response, and directory assistance listing data." Whitman 2d Decl. ¶ 6.

---

[23] For purposes of the remainder of this discussion, the Court assumes *arguendo* that LSSi, as opposed to Volt, is the party to the AT&T and Frontier relationships.

The Court has also reviewed the various agreements in the record between LSSi and a number of LECs.  In none has the LEC delegated to LSSi the responsibility for actually providing directory assistance on its behalf, or come close to doing so.[24]

Under the TCA and the FCC's orders, the ancillary or support role that LSSi appears to play with regard to AT&T and Frontier's provision of directory assistance is not enough to entitle LSSi to access TWC's DA data.  As the Court reads the FCC's orders, the FCC construed § 251(b)(3) to require a LEC's agent to play a more substantial role in connection with the LEC's provision of directory assistance before the agent may claim a legal right of access on the LEC's behalf to a competing LEC's database.  Specifically, the FCC has indicated, the competing LEC's agent must itself be a "DA provider," *i.e.*, provide directory assistance on the competing LEC's behalf.  *See* 2001 Order, 16 FCC Rcd. 2736, at ¶ 27.  The FCC's orders do not suggest that, where a competing LEC's agent merely sells data to the CLEC, or leases it workstations or a search engine, but where the CLEC itself retains responsibility for providing directory assistance, the agent has a statutory right to access to the subscriber data of the CLEC's competitors.  Where the CLEC is providing directory assistance, it is the CLEC that the right to access its competitors' data—and the CLEC itself that should be requesting it.

This reading is consistent with the statutory purposes that led the FCC to recognize a right for directory assistance agents of CLECs to access a providing LEC's DA data.  As the FCC acknowledged, some carriers do not have the economies of scale "to construct and maintain directory assistance platforms of their own."  Therefore, it is sensible, and "significantly aids the development of competition," to afford the § 251(b)(3) data access right to the agents who

---

[24] Ironically, the record does contain proof of the delegation of such services by one LEC: TWC. The undisputed evidence shows that, rather than provide directory assistance services directly itself, TWC has delegated that responsibility to KGB.  *See* Section II.B.1, *supra*; Hg. Tr. 203.

supply the directory assistance platform on the carrier's behalf.  *See* 2001 Order, 16 FCC Rcd.

2736, at ¶ 27; *In the Matters of Implementation of the Telecommunications Act of 1996, Third*

*Report and Order*, 14 FCC Rcd. 15550, at ¶ 183 (1999) (the "1999 Order").  There is less

evident need to do so, however, where the carrier maintains its own directory assistance

platform, and merely enlists other entities to help it out, in support roles.  There is still less need

to do so where—as remains the case in this litigation—the carrier has not submitted a "letter or

other documentation . . . evidencing its intent that [the agent] receive database access."  2001

Order, 16 FCC Rcd. 2736, at ¶ 27.

　　　　To recognize a right of access for LSSi, on the facts at hand, would, in practice, recognize

a right of access for all sorts of limited-purpose agents—including any vendor that sells data to a

competing LEC or lends it office or computer support in connection with directory assistance—

to the subscriber data of the CLEC's competitors.  And, because an entity that receives access to

data under § 251(b)(3) is unrestricted in its use of such data, such an application of § 251(b)(3)

would be in tension with the TCA's efforts to balance the interest in a procompetitive

telecommunications market with the interest in subscriber privacy.  For example, 47 U.S.C. §

222(e) of the TCA gives "directory publishers" a right to obtain subscriber list information for

the purpose of publishing directories, but the providing carrier may take "reasonable steps" to

limit the data to being used for that purpose, and not, for example, for "the preparation of direct

marketing lists."  *See* 1999 Order, 14 FCC Rcd. 15550, at ¶¶ 112–13; *see also* 2001 Order, 16

FCC Rcd. 2736, at ¶¶ 3, 32 (declining to interpret § 251(b)(3) to grant DA providers

nondiscriminatory access to a LEC's national (as opposed to local) DA listings based on

competition in one jurisdiction); Hg. Tr. 161 (statement of LSSi's counsel acknowledging that

data aggregators and sellers do not have rights under § 251(b)(3) to listing data of competitors'

subscribers).[25]  Although Congress or the FCC one day may determine that liberally granting access to a providing LEC's DA data to any agent who provides any kind of directory assistance-related support to a competing CLEC is warranted, neither § 251(b)(3) nor the FCC's interpretations of it provide for that outcome now.

The Court, finally, addresses an argument LSSi made for the first time in its reply brief in support of this motion:  that it serves as a directory assistance agent to an additional LEC, KGB. LSSi stated that KGB is (1) a LEC competing with TWC, and (2) a directory assistance agent of LECs competing with TWC.  *See* LSSi Supp. Rep. 10; Davis 3d Decl. Ex. E.  LSSi did not identify the states in which KGB is, purportedly, certified as a LEC.  Nor did it identify the LECs (apart, of course, from TWC) for which KGB, purportedly, serves as an agent.  LSSi Supp. Rep. 10.  LSSi did, however, supply a copy of a vendor agreement between LSSi and KGB.  *See* Davis 3d Decl. Ex. E.

For two reasons, the Court does not credit LSSi's claim, based on its relationship with KGB, of entitlement to TWC's listing data.

First, LSSi's claim was made too late to be fairly considered on this motion.  After listing KGB in its interrogatory responses as a carrier whom it serves as a directory assistance agent, *see supra*, note 20, LSSi did nothing to pursue this thesis.  LSSi did not produce a letter from KGB; it does not appear to have pursued discovery on this point; it did not make such a claim in its

---

[25] In this litigation, LSSi originally sought access to TWC's data in its capacity as a "directory assistance publisher."  In the December 7, 2011, discovery conference, TWC noted its position that such a publisher does not have the right to resell data it receives in that capacity.  *See* Dec. 7, 2011 Tr. at 32 (Dkt. 91).  In the stipulation that the Court endorsed on December 13, 2011, LSSi stated that it was dropping that claim as a basis for preliminary relief.  Dkt. 52.

opening brief; and, in his declaration on this point, Oldach did not list KGB among the carriers whom LSSi served as an agent.  *See* Oldach Supp. Decl. ¶ 4.

Under these circumstances, granting injunctive relief in favor of LSSi based on its reply claim of entitlement to data based on KGB would be unfairly prejudicial to TWC, which did not have a meaningful opportunity to meet this claim.  LSSi's argument based on KGB is, therefore, "not properly considered" at this stage.  *Behzadi & Brenjian Carpet v. David & Son Oriental Rugs Corp.*, No. 07-cv-7073, 2009 U.S. Dist. LEXIS 28892, at *8–9 n.3 (S.D.N.Y. Mar. 19, 2009) (quoting *Johnson & Johnson v. Guidant Corp.*, 525 F. Supp. 2d 336, 359 (S.D.N.Y. 2007)); *see also Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 416 n.5 (S.D.N.Y. 2009); *FTC v. Medical Billers Network, Inc.*, 543 F. Supp. 2d 283, 314 (S.D.N.Y. 2008) (citing *In re Dobbs*, 227 F. App'x 63, 64 (2d Cir. 2007) ("[W]e think that it was entirely proper for the District Court to decline to consider debtor-appellant's argument, raised for the first time in its reply brief"), *Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) ("Arguments made for the first time in a reply brief need not be considered by a court.")).

Second, on the merits, the contract between LSSi and KGB *refutes* LSSi's claim that it provides directory assistance services to KGB of the sort required by the 2001 Order.  The LSSi/KGB agreement reflects that LSSi will provide KGB with access to *LSSi*'s own database for the purpose of assisting *KGB* in providing directory assistance services to its own customers. Thus, the agreement identifies LSSi's contractual duty to KGB as, solely, "using diligent commercial efforts to maintain and update the Listing Database" as needed.  Davis 3d Decl. Ex. E at LSSI00001552.  But, as discussed, an entity that does not itself provide directory assistance to the LEC's customers, but merely sells data or provides logistical support to an LEC that itself retains responsibility for providing directory assistance, is not, under the 2001 Order, entitled to

the subscriber data of the LEC's competitors.  Indeed, a provision on page 3 of the contract between LSSi and KGB appears explicitly to *prohibit* LSSi from providing directory assistance services to KGB's consumers.  It states that "LSSi shall not compete with KGB by providing Directory Assistance Services independently through live operators, automation, SMS or Internet."  *Id.* at LSSI00001553.  Therefore, to the extent LSSi argues that it is providing directory assistance services as an agent of KGB, the text of its own agreement with KGB defeats that claim.

For the foregoing reasons, the Court finds that LSSi has failed to show, let alone clearly, an entitlement to TWC's DA data, on the grounds that it is an agent of a competing LEC providing directory assistance services on behalf of that CLEC.

Although not necessary to its decision, the Court notes, finally, that even LSSi's website belies its claims here.  *See* Oldach 3d Supp. Decl. Ex. 1.  The website indicates (consistent with the AT&T and Frontier letters and LSSi's contract with KGB) that LSSi serves as a vendor assisting entities (principally through the sale of data) that *do* provide directory assistance to customers.  Thus, LSSi holds itself out as "a supplier of names, addresses, and phone numbers utilized by the Directory Assistance market for many years."  *Id.* at LSSI00004517.  Volt's website is in accord.  It states that LSSi "provides database-marketing services, data-processing, listing verification, and mobile and online data solutions to a variety of companies across a broad spectrum of industries, including telecommunications service providers and cable operators, credit and collections, direct marketers, and online and offline retail providers."  *Id.* at LSSI00004527.   Notably absent is any statement that LSSi itself provides directory assistance on behalf of LECs, let alone assuming those responsibilities for a LEC.

### 3.      Is LSSi "a Competing Provider of Call Completion Services"?

LSSi's third basis for claiming entitlement to TWC's DA data under § 251(b)(3) is that it is a competing provider of "call completion" services.

### a.  The FCC's guidance

The FCC has explained that affording data access rights to entities that provide "call completion" services follows from two sections of the TCA: § 251(b)(3), which confers data access rights on competing providers of "telephone exchange service," and § 153(54), which, as noted, defines "telephone exchange service" in two ways:

> (A) service within a telephone exchange, or within a connected system of telephone exchanges within the same exchange area operated to furnish to subscribers intercommunicating service of the character ordinarily furnished by a single exchange, and which is covered by the exchange service charge, or (B) comparable service provided through a system of switches, transmission equipment, or other facilities (or combination thereof) by which a subscriber can originate and terminate a telecommunications service.

47 U.S.C. § 153(54).

In the 2001 Order, the FCC stated that to fit within § 153(54)(A), "a provider's service must permit 'intercommunication' among subscribers." 16 FCC Rcd. 2736, at ¶ 17.  It stated that "the call-completion service offered by many competing DA providers," in which they not only look up the recipient's phone number but also complete the call, "constitutes intercommunication because it permits a community of interconnected customers to make calls to one another."  *Id.* However, the FCC noted, to qualify under § 153(54)(A), "the service in question [must also] be 'covered by the exchange service charge.'" *Id.* at ¶ 19.  Where a directory assistance provider offers call completion service for callers located within the same exchange area, and charges the end user for that service, that charge is sufficient to qualify as an "exchange service charge."  *Id.* Accordingly, where a directory assistance provider connects calls between customers in the same exchange area and imposes charges for that service, it is providing "telephone exchange service,"

and is entitled under § 251(b)(3) to non-discriminatory access to the DA data of competing

LECs.  *Id.*  The FCC also concluded that call completion services can satisfy § 153(54)(B),

which extends the definition of "telephone exchange service" to "comparable services" to those

in the preceding subsection, because such services are the type of "non-traditional means of

communication within a local calling area" that § 153(54)(B) was intended to embrace.  *Id.* at ¶

21.

 Synthesizing its analysis of the two subsections, the FCC emphasized—in language

important here—that "not all DA providers' [call completion] service may satisfy the statutory

requirements."  *Id.* at ¶ 22.  The FCC agreed with a commenting party that a directory assistance

provider that "may merely hand the call off to another carrier to complete the call and charge the

calling party" is not "actually complet[ing] the call," and is thus "not a provider of telephone

exchange service, and should not obtain access to the incumbent LECs' directory assistance

databases under § 251(b)(3)."  *Id.*  Rather, it stated:

> If a competing directory assistance provider does not complete the call either
> through its own facilities or through resale and impose a separate charge for such
> service, but rather simply passes a call to another entity that provides all elements
> of call completion (*i.e.*, that completes the call and charges the customer for the
> service), the competing directory assistance provider is not providing telephone
> exchange service within the meaning of section [153(54)].

2001 Order, 16 FCC Rcd. 2736, at ¶ 22.

 The FCC emphasized that, to satisfy this test, the call completing entity need not itself

own the switches used to provide the call completion.  *Id.* at ¶ 23.  Such a requirement "would

undermine the benefits that competing DA providers bring to the emerging directory assistance

market."  *Id.* at ¶ 24.  A provider that completes a call using another LEC's switches, and resells

service on that other LEC's facilities, is entitled to nondiscriminatory access to DA data under §

251(b)(3).  *Id.* at ¶ 23.[26]

### b.  Evidence presented by the parties

In arguing in its opening brief that it provides call completion services, LSSi relied on a

declaration from its President and Rule 30(b)(6) designee, Oldach.  LSSi Supp. Br. 19.[27]  As to

the call-completion issue, Oldach's declaration stated simply:  "LSSi and VoltDelta also provide

call completion services for a number of LEC customers including, among others, AT&T,

Verizon, Frontier, and ITC Deltacom.  This call completion service is national in scope."  *See*

Oldach Supp. Decl. ¶ 10.

In its opposition brief, TWC countered, first, by arguing that to the extent LSSi claimed

to perform call completion services outside of Oregon, Utah, and Washington, LSSi is doing so

unlawfully, because only a certified LEC may perform call completion services.  And, TWC

argued, LSSi may not seek TWC's listing data based on services it provides unlawfully.  *See*

TWC Supp. Br. 15–16.  Second, TWC argued, Oldach's summary claim that LSSi performs call

completion services is not reliable, including because (1) Oldach had denied, in a sworn

---

[26] The FCC has stated that a directory assistance provider can also qualify for access to a LEC listing data under § 251(b)(3) where it completes "a toll call for a requesting customer via a toll provider whose service the DA provider offers, either through its own facilities or through resale," and thereafter imposes a "charge for this service."  *Id.* at ¶ 25.  LSSi has not argued that those conditions are met here.

[27] In its responses to interrogatories, LSSi had stated that it provides call-completion services to telecommunications carriers "throughout the United States."  LSSi Interrog. Resps. at 6–7.  LSSi later supplemented its responses.  It stated that it "uses switches and other facilities it owns or controls" to provide call completion services, and does not "'simply [pass] a call to another entity that provides all elements of call completion'"; that it "charges for call completion and collects payment from each customer for each call," and that, where it completes a call between subscribers served by different carriers, "LSSi retains control of the call all the way to the point of termination at the location of the called party."  LSSi Supp. Interrog. Resps. 3–4 (quoting 2001 Order, 16 FCC Rcd. 2736, at ¶ 22); *see also id.* at 4–5.

submission to a state regulator, that LSSi performs such services; and (2) in his deposition, Oldach admitted various facts inconsistent with the FCC's requirements as to call completion. *Id.* at 17–18.  TWC also submitted a declaration from Lewis, the assistant vice president of Frontier.  There, Lewis attested that "Frontier uses its own network to provide . . . call completion services" and "does not contract with LSSi or VoltDelta to provide call completion services."  Lewis Decl. ¶¶ 4–5.

Along with its reply brief, LSSi supplemented its proof on this point.  It submitted a new declaration from Lewis, of Frontier, in which Lewis stated that "LSSi and VoltDelta do provide directory assistance call completion services in conjunction with their directory assistance services to Frontier" and that "[t]here is no other entity to whom they pass off this responsibility or who provides all elements of call completion."  Lewis 2d Decl. ¶ 7.  Lewis added: "Without those services, Frontier cannot complete a directory assistance call.  Volt Delta charges for this service."  *Id.*  In its reply brief, LSSi also claimed that the FCC had based its "findings [in the 2001 Order] that call completion did qualify under § 251(b)(3)" on LSSi's call completion operations.  LSSi Supp. Rep. 7.

The subject of call-completion, finally, figured prominently at the April 19, 2012 hearing on LSSi's preliminary injunction motion.  Oldach's direct testimony at that hearing, submitted in the form of a sworn declaration, described in more detail the services on which LSSi based its call-completion claim.  Oldach 3d Supp. Decl. ¶¶ 7–10.  Oldach also attached a recent (April 10, 2012) amendment to a contract between LSSi and MASS, Inc., which stated that MASS was retaining LSSi to perform call completion services on its behalf.  *Id.* at ¶¶ 12–13.  For its part, TWC vigorously cross-examined Oldach on this point at the hearing, including as to his prior

testimony and statements about call completion, and about the mechanics of the services LSSi

provides.  The Court also questioned Oldach on this subject.

### c.  Analysis

In evaluating the evidence as to LSSi's claim of entitlement to DA data on this ground,

the Court is mindful that "call completion services" as used in the 2001 Order is a term of art—it

has a distinct, technical meaning.  As the FCC synthesized, the entity in question must impose a

"separate" charge for such services, and it must effect call completion either "through its own

facilities or through resale."  2001 Order, 16 FCC Rcd. 2736, at ¶ 22.  Particularly given the

technical nature of the term, a declarant's conclusory claim that LSSi provides "call completion

services," without evidence of the specific services LSSi provides and on what terms, is

insufficient.  Only through such evidence can the Court meaningfully compare LSSi's offerings

to the 2001 Order's specifications.

***Richard Oldach's declarations and testimony***:  On the record before it, the Court is

compelled to view the claim by Oldach—on whom LSSi has primarily relied to establish its

entitlement as a call-completer—with skepticism.  In his first declaration, made before the case

was transferred to this Court, Oldach swore that LSSi and VoltDelta "provide call completion

services for a number of LEC customers including, among others, AT&T, Verizon, Frontier, and

ITC Deltacom.  This call completion is national in scope."  Oldach Supp. Decl. ¶ 10 (executed

August 15, 2011).  However, the evidence also showed that, just two months later, Oldach swore

to the opposite proposition, in an application to a state regulator.

Specifically, on October 14, 2011, LSSi submitted an application for certification as a

CLEC to the Ohio Public Utilities Commission ("the Ohio PUC") ("LSSi Ohio Application").

*See* Sherman Decl. Ex. 11.  In several places in that application, Oldach attested under oath to its

truthfulness, including stating at the end:

> I am an authorized representative of the applicant corporation LSSI Data Corp.
> and I am authorized to make this statement on its behalf.  I attest that I have
> utilized the Telecommunications Supplemental Application Form for Carrier
> Certification provided by the Commission, and that all of the information
> submitted here, and all additional information submitted in connection with this
> case, is true and correct.

LSSi Ohio Application at 8.  In the application to the Ohio PUC, LSSi represented that it

"intends to use the requested CLEC certification to provide resold and call completion services

to business customers in Ohio," *id.* at Ex. A,[28] and, important here, that LSSi "*does not currently*

*provide its proposed service* [*i.e.*, call completion] *to any customers in any jurisdiction*."  *Id.* at

Ex. H (emphasis added).

On January 31, 2012, Oldach was deposed in this matter.  In that deposition, before being

confronted with his sworn statement to the Ohio PUC, Oldach testified that LSSi does "provide

411 call completion."  Oldach Dep. 49.  Later, however, Oldach was confronted with his sworn

statement to the Ohio PUC, to the effect that LSSi does *not* perform call completion in any

jurisdiction.  Oldach thereupon reversed course.  He testified that he believed his earlier

representation to the Ohio PUC had been accurate:

> **Q:**  In the second sentence of the first paragraph, it says, "LSSi Data does not
> currently provide its proposed service to any customers in any jurisdiction.  LSSi
> Data plans to introduce such services."  Is it accurate that LSSi Data does not
> currently provide the service proposed in this document to any customers in any
> jurisdiction?
>
> **A:**  I assume so.

---

[28] Ohio's requirement that an entity apply for certification to provide call-completion services
appears to support (at least in that jurisdiction) TWC's argument that, to perform call-completion
services sufficient to satisfy § 251(b)(3), a directory assistance provider must be certified in that
jurisdiction as a LEC.  *See supra* at p. 41.

*Id.* at 143.

In so testifying, Oldach thus represented that as of January 31, 2012—months after this lawsuit was filed and deep into discovery on LSSi's preliminary injunction motion—he "assume[d]" that LSSi does not provide call-completion services "to any customers in any jurisdiction."  As LSSi's corporate designee under Rule 30(b)(6), Oldach's effective denial that LSSi performs call-completion services in any jurisdiction binds the company.  *A&E Prods. Group, L.P. v. Mainetti USA Inc.*, No. 01-cv-10820, 2004 U.S. Dist. LEXIS 1510, at *16 (S.D.N.Y. Feb. 4, 2004) ("Testimony of a Rule 30(b)(6) witness is binding on the party that designates the witness.") (citing *Reilly v. Natwest Mkts. Grp., Inc.*, 181 F.3d 253, 268 (2d Cir. 1999), *cert. denied*, 528 U.S. 1119 (1999)); *Fleurimond v. New York Univ.*, No. 09-cv-3739, 2011 U.S. Dist. LEXIS 83288, at *7 (E.D.N.Y. July 29, 2011); *Spanski Enters. v. Telewizja Polska, S.A.*, No. 07-cv-930, 2009 U.S. Dist. LEXIS 95288, at *7 (S.D.N.Y. Oct. 13, 2009 ); *Rahman v. Smith & Wollensky Rest. Grp., Inc.*, No. 06-cv-6198, 2009 U.S. Dist. LEXIS 30275, at *4 (S.D.N.Y. Mar. 18, 2009)

On April 10, 2012, after TWC submitted its brief highlighting Oldach's inconsistencies, the Court held a telephone conference with the parties, to discuss the upcoming hearing on LSSi's motion.  The Court gave LSSi until Wednesday, April 11, 2012, to disclose whether it would call any witnesses, and until Friday, April 13, 2012 to produce, in declaration form, the direct testimony of such witnesses.  LSSi stated that it was considering calling Oldach; the following day, it confirmed that it would do so.  On April 13, 2012, LSSi submitted Oldach's direct testimony to the Court.  *See* Oldach 3d Supp. Decl.  An exhibit to that declaration was a letter, dated April 12, 2012, from an LSSi staff counsel, Peter Norman Black, to the Ohio PUC. The letter stated that "it had recently come to LSSi's attention" that Exhibit H to LSSi's October

[45]

14, 2011 application "contained an inadvertent error," and attached a revised Exhibit H. *See id.* at Ex. 4. Black's letter did not specify the error in LSSi's initial Exhibit H. The revised Exhibit H consisted of removing Oldach's representation in the original that LSSi does not provide call completion services in any jurisdiction. *Id.*

On April 19, 2012, Oldach gave live testimony before the Court. Among other lines of questioning as to call completion, Oldach was asked about LSSi's representations to the Ohio PUC. Oldach testified that after his January 31, 2012 deposition, at his direction, LSSi had "conducted an investigation to determine whether it was providing . . . call completion services in any jurisdiction in the United States." Hg. Tr. 30. That "investigation," he testified, had determined that its statement to Ohio that it was not providing call completion services had been false. *Id.* Asked when LSSi's investigation had determined this fact; Oldach responded that it was around the end of February 2012. *Id.* at 46. The Court then asked Oldach why it had taken LSSi until April 12, 2012 to correct its false statement to the Ohio PUC, and whether what had prompted LSSi *on that date* to correct its false statement was Oldach's upcoming testimony before this Court, as opposed to a perceived duty to the Ohio PUC (which had granted LSSi's application on February 2, 2012) to correct LSSi's falsehood. *Id.* at 47. Visibly uncomfortable, Oldach denied this. *Id.* at 48. He testified that LSSi had decided to correct the statement to Ohio three or four weeks earlier but was relying on counsel and had not made correcting its false statement to the Ohio PUC "a top priority." *Id.* He explained: "[I]t's just how long it takes us to get things done, frankly." *Id.*

Under these circumstances, Oldach's declarations and testimony that LSSi provides qualifying call completion services anywhere, let alone nationwide, simply cannot be credited, absent convincing corroborative evidence. Within two months' time, Oldach made diametrically

[46]

opposite statements under oath on this issue.  He even swore, in his Rule 30(b)(6) deposition in this litigation, that he assumes that LSSi does *not* perform such services, anywhere in the nation. It is hard for the Court to believe that, if LSSi did indeed provide call-completion services throughout the United States, Oldach, its President and Rule 30(b)(6) witness, could possibly have given this sworn testimony on a central issue in this litigation.  The Court is also troubled that LSSi did not correct its sworn representations to the Ohio PUC until it became clear that Oldach would testify under oath in this litigation—and face cross-examination—the following week.  If LSSi had truly uncovered a false statement it had made about a pending application for certification with the Ohio PUC, its obvious duty was to correct that statement immediately.

The Court is compelled to conclude that Oldach, and derivatively LSSi, have not taken their duties with respect to the oath seriously.  Although they have made broad conclusory claims before this Court (and before the Northern District of Georgia) that LSSi is entitled to data under § 251(b)(3) by virtue of providing nationwide call completion services, those claims cannot be presumed accurate, in light of Oldach's denial of this to the Ohio PUC and his adoption of that denial during his deposition in this case.  Rather, Oldach's claims, like the claims of any witness who is both compromised and interested, may be credited only to the extent corroborated by persuasive, neutral evidence.

***Todd Lewis's declarations***:  The Court turns, then, to the two declarations by Todd Lewis, of Frontier, which LSSi identified as an entity for which it provides call completion services.  In the first, submitted by TWC, Lewis stated that "Frontier does not contract with LSSi or VoltDelta to provide call completion services," *see* Lewis Decl. ¶ 5; in the second, submitted by LSSi, Lewis stated that Frontier *does*, in fact, contract with VoltDelta and LSSi to provide directory assistance services, an element of which is call completion, and "[t]here is no other

[47]

entity to whom they pass off this responsibility or who provides all elements of call completion."
*See* Lewis 2d Decl. ¶ 7.

The Court has no reason to doubt Lewis's veracity.  However, his second declaration is
insufficient to establish that LSSi performs call-completion services for Frontier.  First, that
declaration is in obvious tension with his first; the two may be harmonized, but only with some
linguistic gymnastics.  Second, his declaration leaves ambiguous whether it is LSSi or Volt that
is performing the services in question; as the Court held in denying LSSi's post-discovery
motion to add Volt as a party, only LSSi's entitlement is cognizable on this motion.[29]  Third,
Lewis's declaration does not address all elements necessary to satisfy the requirements of call
completion as posited in the FCC's 2001 Order.  For example, it does not state that LSSi
"impose[s] a separate charge for such [call completion] service."  (Lewis stated only that *Volt*
imposes some form of charge in connection with its work.)  Fourth, and most important, as to the
representations it does make, Lewis's declaration is too conclusory and devoid of corroborative
details.  Lewis does not supply any detail about, for example, the mechanics of LSSi's services,
how long LSSi has supplied these services to Frontier, whose facilities are used to complete the
call, how concretely Volt charges or receives compensation for its role in facilitating call
completion, and whether that charge is a "separate" charge as required by the FCC.  *See* 2001
Order, 16 FCC Rcd. 2736, at ¶ 22.

The Court also notes the absence of documentary corroboration for LSSi's claims as to its
call completion work for Frontier.  To the extent LSSi provides such services consistent with the
specifications in the 2001 Order, LSSi's business records, presumably, should have ample
evidence of that work—whether in the form of interconnection agreements, invoices or billing

---

[29] For the balance of this discussion, the Court assumes *arguendo* that all call completion
services attributed, in whole or in part, to Volt were performed by LSSi.

records, and/or records illuminating concretely the work done by LSSi.  On the basis of Lewis's second declaration, the Court can conclude only that LSSi provides some form of services to Frontier in which it assists Frontier in fielding directory assistance calls from some customers, and, presumably offers customers the opportunity to have their calls completed in an unspecified fashion.  The sparse record, however, prevents the Court from concluding that these services meet the definition of "call completion" in the 2001 Order.

*LSSi's agreement with MASS*:  The Court turns, next, to LSSi's contract with MASS.  On April 13, 2012, as an exhibit to Oldach's written testimony, LSSi submitted an April 10, 2012 amendment to LSSi's existing contract with MASS.  *See* Oldach 3d Supp. Decl. Ex. 3.  The original contract between LSSi and MASS had been signed by representatives of LSSi and MASS in December 2011 and January 2012.  Oldach 3d Supp. Decl. Ex. 2.  Section 1 of that contract ("The Services") describes database access services that LSSi will provide "in support of the requirements of MASS and its Customers."  *Id.*  The original contract says nothing about "call completion."  *Id.*

In his written testimony, Oldach stated that LSSi and MASS decided to amend that contract "to clarify the nature of the call completion services LSSi is providing under the parties' agreement."  Oldach 3d Supp. Decl. ¶ 12.  Oldach testified that, "[k]nowing that there has been considerable focus in this case regarding how call completion works, I asked our contracts personnel to try to use language in the MASS amendment that not only describes the services for the benefit of the parties, but will also be readily comprehensible to non-parties, such as this Court, who are less familiar with the nature of LSSi's call completion services."  *Id.* ¶ 13.

The April 10, 2012 amendment alters Section 1 of the contract between LSSi and MASS. It provides that, in addition to the database access services described in the original contract,

LSSi will provide "Automated Directory Assistance and Call Completion Services" to MASS, pursuant to which LSSi's directory assistance platform, after finding a number requested by MASS, "will deliver successfully automated calls for automated call completion and connection to the listing number." *Id.* Ex. 3 at LSSI 00004509. The amended agreement states that LSSi will provide this additional service to MASS in exchange for the fee set out at Exhibit B to the contract. *Id.* Exhibit B, in turn, states that MASS will not be charged for the first 5,000 calls it makes each month using this service, but will be charged 70 cents for each further call. *Id.* at LSSI00004511.

For three reasons, the Court declines to consider, for purposes of the pending motion for a preliminary injunction, LSSi's amended contract with MASS. First, the amended contract was executed the week before the preliminary injunction hearing, long after discovery closed and briefing was complete. It would unfairly prejudice TWC to grant LSSi access to TWC's listing database based on a business agreement which TWC had no practical opportunity to probe in discovery.

Second, notwithstanding LSSi's claim that the contract was amended merely "to clarify" LSSi's services under the agreement, *see* Oldach 3d Supp. Decl. ¶ 12, on its face, the amendment is clearly substantive. It provides, for the first time, that LSSi will furnish call completion services to MASS, and adds a payment arrangement with respect to those services. *See* Hg. Tr. 23 (Oldach testimony, admitting that the purpose of the agreement "was to allow MASS and its employees to use the service for directory assistance call completion."). Whether or not, as TWC suggests, LSSi was motivated to enter into the amended contract by the fact of the imminent hearing in this case, the amendment materially changes the parties' respective duties to each other.

[50]

Third, on its face, the amended agreement leaves unclear whether the call completion services that LSSi would provide satisfy the FCC's technical requirements with regard to call completion. The amended agreement does not state whose facilities would be used to complete calls, or how, mechanically, calls would be completed. Nor is it clear that the parties' payment arrangement would satisfy the FCC's requirement that the provider of call completion impose a separate charge for this service: Under the agreement, LSSi provides free services for the first 5,000 calls it completes for MASS, and thus far has not collected any money under it. *See* Hg. Tr. 23 (Oldach: "We're charging fees at a cost of zero."). At a minimum, additional discovery on these points would be needed on these issues before the Court could find, based on them, that LSSi was entitled to access to TWC's directory assistance listings.

***The FCC's previous statements***: LSSi's final argument to corroborate Oldach is that the FCC has already implicitly determined that LSSi is a provider of call completion services. In support of this claim, LSSi cites portions of the 2001 Order, in which the FCC referred to LSSi, which had commented on the FCC's proposed order, in the course of its discussion of call completion. *See* LSSi Supp. Rep. 4–8; *see also* 2001 Order, 16 FCC Rcd. 2736, at ¶¶ 18 n.50, 21 n.58, & 24. LSSi argues that the FCC's rules relating to call completion were patterned on LSSi's services, and that these citations reflect an implicit recognition by the FCC that LSSi was a provider of call-completion services. *See* Hg. Tr. 119.

The Court rejects this argument, for three reasons. First, as LSSi's counsel conceded at the hearing, *see* Hg. Tr. 121, the FCC's 2001 Order was not an adjudicative proceeding and was not concerned with the status of any particular commenting party, such as LSSi. The FCC did not receive any evidence on the status of any industry participant, nor did it undertake to resolve any such issue. The 2001 Order was instead the product of a rulemaking—the FCC set out, after

[51]

careful review, the agency's construction of various statutory terms. To the extent the FCC might have referred to an industry participant in a particular fashion, such characterization did not reflect a binding determination. *See Channer v. Dep't of Homeland Sec.*, 527 F.3d 275, 280 (2d Cir. 2008) (collateral estoppel may be appropriate based on administrative determinations of fact, but only where "an administrative agency is acting in a judicial capacity and resolved disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate.") (quoting *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966)); *see also Chauffeur's Training Sch., Inc. v. Spellings*, 478 F.3d 117, 132 (2d Cir. 2007).

Second, contrary to LSSi's supposition, a close review of the 2001 Order reveals that the FCC did not categorize LSSi as a provider of call completion services. Much less did it set out anywhere *concretely* what services LSSi represented that it performed or how LSSi performed them. In the portions LSSi cites, the FCC does no more than cite LSSi as a party that commented on aspects of the issue, or, generally, as "a provider of directory assistance service." *See* 2001 Order, 16 FCC Rcd. 2736, at ¶ 7; 1999 Order, 14 FCC Rcd. 15550, at ¶ 155.

Third, even if the FCC had found LSSi to be a provider of call completion services, the 2001 Order was issued *11 years ago*. There is no reason to assume—and LSSi has not even asserted—that the services it provides today are identical to those offered in 2001. *See* Oldach 3d Supp. Decl. Ex. 1 at LSSI00004519 (noting that LSSi has both been acquired, and entered into a merger, since 1999).

***Additional shortcomings in LSSi's proof***: Finally, even if Oldach's uncorroborated statements and testimony were credited, the Court still would not find that LSSi is entitled to relief, because his factual claims, fairly reviewed, fall short of demonstrating, let alone clearly, that LSSi meets the specifications of the 2001 Order. Particularly relevant here, the FCC has

[52]

explained that a provider of call completion services may qualify for access to a LEC's DA data only if it (1) completes the call "through its own facilities or through resale" and (2) imposes a "separate" charge for that service.  2001 Order, 16 FCC Rcd. 2736, at ¶ 22.

Addressing the second requirement first, the record does not reliably establish that LSSi imposes a "separate" charge for performing call completion services.  In his written direct testimony, Oldach set out for the first time the multi-step process by which LSSi provides what he called "directory assistance call completion service."  Oldach Supp. 3d Decl. ¶ 7.  He stated that LSSi identifies the number requested by the caller; determines whether, as to that number, "call completion is available"; interacts with the caller to see "whether the caller would like to initiate call completion service"; requests "the network to connect the caller to the requested number"; confirms "that the caller and the requested number are connected"; and records the billing information."  *Id.*  Oldach stated that, "in general, this service is available only for an additional fee that will be charged to the caller by LSSi, either by LSSI directly or indirectly through the caller's home carrier."  *Id.* at ¶ 7(c).

During his deposition and at the hearing on LSSi's motion, however, Oldach testified to a contrary practice.  In his deposition, he testified that LSSi does not "issue direct-to-end-user bills," Oldach Dep. 52–53, and collects fees only from its customer, the LEC, not the caller.  *Id.* at 138–39.  In his live testimony before the Court, Oldach testified that the caller is *not* charged any incremental fee for deciding to use LSSi's call completion services, but instead is charged a flat fee for all directory assistance services the caller chooses to use, regardless of whether the caller opted to ask LSSi to connect the call.  Hg. Tr. 82–83.  Oldach further testified that LSSi does *not* charge the LEC extra for the act of call completion, and that the customer is not charged extra, either.  *Id.* at 82, 85–86, 91–92 (agreeing that "the incremental charge is zero").  This

testimony describes a practice that is simply not consistent with the 2001 Order's requirement of a "separate charge."

Oldach explained LSSi's reason for imposing a single bundled charge today for its services, and for foregoing an incremental charge for call completion:  The market for directory assistance services, he testified, has evolved "away from that," such that LSSi would not be competitive today if it imposed an additional charge for assisting call-completion.  Hg. Tr. 92.  Be that as it may, the 2001 Order construing § 251(b)(3) to require imposition of a "separate charge" before a provider of call completion services can qualify as a "provider of telephone exchange service" remains good law, and this Court owes deference to "the FCC's construction of a statute that it administers."  *New York v. FCC*, 267 F.3d 91, 103 (2d Cir. 2001) (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) (internal brackets omitted)); *see also Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980–81 (2005) (applying *Chevron* deference to FCC's construction of statute it administers).  Until such time as either the TCA is amended or the FCC revises its construction of § 251(b)(3), the Court is compelled to defer to the FCC's reasonable interpretation of the statute to require that there be a "separate charge."  Oldach's testimony on this point precludes any such finding.

In addition, LSSi has not demonstrated that the directory-assistance activity that it undertakes entails the completion of calls either (1) "through its own facilities" or (2) "through resale," as required by the 2001 Order.  LSSi primarily argued the former—that it engages in call completion "through its own facilities."  In its interrogatory responses, LSSi represented that it owns switches, nodes, or other "points of presence" in several states, and that through these devices it routes customer calls to the public-switched telephone network, which in turn routes calls to the corresponding numbers.  *See* LSSi Supp. Interrog. 3–6; *see also* LSSi Interrog. 11.

[54]

LSSi also represented that "where LSSi completes a call between subscribers served by different carriers, LSSi retains control of the call all the way to the point of termination at the location of the called party."  LSSi Supp. Interrog. 4.

Oldach's testimony, however, indicated that LSSi plays only an intermediary role between the caller and another telecommunications carriers—a role seemingly inconsistent with the notion that LSSi "completes" calls, instead of merely "hand[ing] the call to another carrier." 2001 Order, 16 FCC Rcd. 2736, at ¶ 22.  Oldach's testimony also did not comfortably establish that LSSi supposed completion work occurs "within the same [telephone] exchange area."  47 U.S.C. § 153(54).  Specifically, Oldach testified that LSSi's "switches tell the network to transmit the call," but that "the network" that "transmit[s] the call" may be owned by others "depend[ing] on what the network configuration is."  Oldach Dep. 47.  Oldach further testified that as to every call where LSSi performs call-completion, "the network and facilities of a third-party telecommunications carrier have to be involved to complete the call," Hg. Tr. 11; that LSSi does not provide residential or business telephone service, but only toll (long-distance) service, *id.* at 13; and that if the caller asks LSSi to complete the call, LSSi will "interconnect with the network of the end subscriber," while continuing to "listen[] on the call" to assure its completion. *Id.* at 79–80.  In summary, Oldach stated, LSSi's "facility is the one causing the call to be completed.  We're in [the call]."  *Id.* at 84.

Although aspects of Oldach's testimony, in isolation, can be seized on to favor LSSi's contention, his overall testimony on this point was considerably less than pellucid.  His ambiguous, general and to some degree conflicting testimony supplies an inadequate basis on which a finding could be made that LSSi completes customers' calls "through its own

facilities."[30]  Oldach's testimony does permit the Court to find, at most, that LSSi receives some customer calls seeking directory assistance, and offers some customers the opportunity for LSSi to place the call on their behalf to the requested number.  However, Oldach's testimony did not supply a basis on which the Court can determine what LSSi's role is, as opposed to that of other carriers, from that point forward in the call completion process.[31]

Nor has LSSi demonstrated that it completes customer's calls "through resale."  There was, in fact, no record evidence that LSSi "resells" customers' calls to other carriers to complete: Oldach did not testify as to any such practice, no agreements for resale (interconnection agreements) were entered into evidence, and, at argument, LSSi's counsel did not identify any actual resale, stating only that "resale is potentially implicated under the idea that the services of

---

[30]  It is not clear to the Court why LSSi chose to rely on Oldach to carry its water on this hotly controverted issue, as opposed to, for example, introducing business records that presumably would have illuminated LSSi's actual practices.  Oldach admitted in his deposition that he was not familiar with the "nitty gritty" of LSSi's call-completion services.  *See* Hg. Tr. 7.  Even after Oldach's credibility on this point had been badly damaged, counsel continued to rely, almost exclusively, on his assertions.  *See* Hg. Tr. 126 ("The Court: How do we know that?  Mr. Williams: You know that because Mr. Oldach has affirmatively testified all the elements that LSSi affirmatively performed.").

[31]  In fairness, too, the FCC's 2001 Order is not entirely clear as to what it means for an entity to complete calls "through its own facilities."  TWC argued that where the "last mile" traveled by a call is over local wires not owned or controlled by the entity at issue, that test of call-completion is not satisfied.  *See, e.g.*, Hg. Tr. 187 (noting LSSi's concession that it does not own the transmission equipment—local copper wires—that connect calls to a recipient's home); *id.* at 191, 195, 197, 200–01; *see also id.* at 84 (Oldach confirms that LSSi does not "own[] the last leg.").  LSSi, in contrast, argued that this test is met more easily:  where a directory assistance call completer complies with a customer's direction to place a call for the customer, and stays on the line to assure that the call reaches its destination, even if a call travels over another carrier's wires to the recipient's home, and even if the call-completer has no presence in the local calling area, as appears to be the case with LSSi.  *See, e.g.*, Hg. Tr. 233.  As between these readings, the Court believes that TWC's focus on ownership of wires and facilities is inconsistent with the 2001 Order, *see* 16 FCC Rcd. 2736, at ¶ 23, but that its construction otherwise more aptly reflects the FCC's reading of the statute than does LSSi's.  However, for the reasons stated, the record before this Court would not permit a factual finding in LSSi's favor even on LSSi's reading.

call completion"—which LSSi allegedly provides—"could be over some form of interconnected system." Hg. Tr. 236.

     *Conclusion*:  For these reasons, the Court concludes that the evidence does not establish, let alone clearly, that LSSi is a provider of call completion services, as defined by the FCC.[32]

\#        \#        \#        \#        \#

     In sum, the Court finds that LSSi has failed to present persuasive evidence that it is an entity entitled under § 251(b)(3) to non-discriminatory access to TWC's directory assistance listing data.

### D.       Non-Discriminatory Access

     Even if LSSi had shown an entitlement under § 251(b)(3) of non-discriminatory access to TWC's listing data, to prevail on this motion, it would still be required to demonstrate that TWC had denied it such access.  LSSi has failed to make such a showing.

### 1.       Legal Standards

     As a threshold matter, LSSi argues that it is TWC's burden to show that it provides non-discriminatory access to LSSi, rather than LSSi's burden to show discrimination.  The FCC's regulations implementing the TCA support that claim.  Under 47 C.F.R. § 51.217(e)(1)(i)–(ii):

---

[32] Because LSSi has not proven that it provides call completion services within the meaning of the 2001 Order in any state, the Court does not have occasion to reach TWC's argument that—except in Oregon, Utah and Washington—any such services would be rendered unlawful.  On an initial review, there is force to the argument that, to be a provider of call-completion services, an entity must be state-certified as a LEC.  In the 2001 Order, the FCC implied that such certification was necessary, but it was not definitive on that point.  *See* 2001 Order, 16 FCC Rcd. 2736, at ¶ 25 n.69 ("*To the extent that* our decision regarding call completion results in a state requiring DA providers to obtain some type of state certification, we encourage state commissions to allow affected DA provider to continue to offer DA services in the interim while they apply for the necessary certification . . . .") (emphasis added).  TWC has directed the Court to regulations in all 50 states requiring some form of LEC certification.

> In disputes involving nondiscriminatory access to operator services, directory assistance services, or directory listings, a providing LEC shall bear the burden of demonstrating with specificity:
>
> (i) That it is permitting nondiscriminatory access, and
>
> (ii) That any disparity in access is not caused by factors within its control. "Factors within its control" include, but are not limited to, physical facilities, staffing, the ordering of supplies or equipment, and maintenance.

TWC has not disputed this point. The Court, accordingly, assumes *arguendo* that it is TWC's burden to establish the absence of discriminatory access.[33]

The FCC has described the duty of a LEC such as TWC to provide non-discriminatory access as follows:

> Section 251(b)(3) also requires all LECs to permit competing providers of telephone exchange service and toll service "nondiscriminatory access to telephone numbers, operator services, directory assistance and directory listings." We conclude that "nondiscriminatory access," as used in section 251(b)(3), encompasses both: (1) nondiscrimination between and among carriers in rates, terms and conditions of access; and (2) the ability of competing providers to obtain access that is at least equal in quality to that of the providing LEC. This definition of "nondiscriminatory access" in section 251(b)(3) recognizes the more general application of that section to all LECs, whereas section 251(c) places more specific duties upon incumbent LECs in terms of nondiscriminatory access. We conclude that the term "nondiscriminatory access to telephone numbers" requires all LECs to permit competing providers access to telephone numbers that is identical to the access the LEC provides to itself.

1996 Order, 11 FCC Rcd. 19392, at ¶ 12; *see also* 1999 Order, 14 FCC Rcd. 15550, at ¶ 9 ("We affirm our requirements that LECs offer access to telephone numbers, operator services, directory assistance, and directory listings that is equal to the access that the LEC provides to itself").

### 2.    LSSi's Arguments

---

[33] Given the procedural posture of this motion, in which LSSi seeks a preliminary injunction that would effectively give it all the relief its lawsuit seeks, it is not clear to the Court that TWC in fact must bear such a burden. However, there is no need for the Court to address that issue, given its determination that TWC has carried that burden.

LSSi argues that TWC is discriminating against it in two ways, both forbidden by the FCC.

First, LSSi asserts that TWC is imposing an unequal "term and condition of access" by giving Targus direct access to TWC's listing data, whereas other market participants must obtain that data secondhand, from Targus. LSSi claims that this practice harms it, because it lengthens the time it takes to receive (and enter into its database) TWC's updated listing data; and because listing data gleaned directly from a carrier is viewed as preferable in the market, and can be sold for a higher price.

Second, LSSi claims that TWC is not granting LSSi access equal to that which TWC provides itself, because TWC has access to its own listing data, but forces its competitors to obtain that data from Targus. *See* LSSi Supp. Br. 2, 20–23 (arguing that customers that might otherwise wish to buy TWC's listing data from it cannot do so, and instead must look to Targus).

### 3.     Analysis

Contrary to LSSi's premise, the evidence convincingly shows that TWC does not itself maintain a freestanding directory assistance database. Instead, it shows that TWC possesses raw customer data which, without processing by its vendors, is not usable for the purposes of providing directory assistance. In 2010, TWC retained two companies, Neustar and Targus, to work in tandem to convert its raw data into a database, with Neustar converting TWC's raw data into a usable data feed, and Targus converting this data feed into a database usable for directory assistance purposes which Targus operates and maintain on behalf of TWC. Minshew Decl. ¶¶ 6, 8, 9; Ainge Decl. ¶ 8. LSSi did not offer any contrary evidence.

The evidence also clearly established that Targus is contractually prohibited from using for its own purposes either the feed of TWC data that it receives from Neustar, or the subscriber

listing database that it creates from that data feed. Targus is limited to using TWC's customer listing data to selling that data, on TWC's behalf, to purchasers legally entitled to receive it. Minshew Decl. ¶ 11; *see also* Ainge Decl. ¶ 5 ("Targus is not permitted to provide TWC's data to third parties without TWC's express consent."). To date, Targus has never asked to provide TWC's data to a third party. Loyer Decl. ¶ 11.

In light of these facts, even assuming LSSi were entitled to nondiscriminatory access to TWC's data under § 251(b)(3), the Court would be compelled to reject each of LSSi's claims of unlawful discrimination, for three reasons.

First, to the extent that LSSi suggests that it is entitled to access to TWC's raw customer data, LSSi is not correct. Section 251(b)(3) affords a competing LEC or its qualifying agent a right of nondiscriminatory access to competing LECs' "local directory assistance *databases*." 2001 Order, 16 FCC Rcd. 2736, at ¶ 1 (emphasis added). It does not, however, textually afford a LEC or its qualifying agent a right of access to a competitor's raw customer data (such as may be contained in customer billing records or the like) other than in the form of such a database. *See also id.* at n.4 ("Access to LEC DA *databases* is the focus of this order, and this access is based on section 251(b)(3)'s more general requirement concerning nondiscriminatory access to directory assistance.") (emphasis added); *id.* at ¶¶ 3, 6, 7, 10 (all specifically citing databases). That distinction is consistent with the purpose of § 251(b)(3), which is to provide a level playing field with respect to access by LECs in a locality (and their qualifying agents) to *directory assistance* information. Put differently, much as LSSi would welcome access to TWC's unfiltered customer data, § 251(b)(3) is not concerned with access to such data that is unusable for the purpose of rendering directory assistance. The fact that TWC, alone among LECs, has access to unfiltered data relating to its own customers does not violate the statute.

[60]

Second, to the extent that LSSi claims that Targus enjoys an unfair advantage over it in that Targus, and not LSSi, receives TWC's customer listing data from TWC, the evidence does not reveal discrimination in violation of law, including § 251(b)(3). TWC was free to contract with the vendor of its choice to create and manage its directory assistance database; TWC chose Targus over LSSi, at least in part because Targus, unlike LSSi, agreed not to sell TWC's customer data to telemarketers. While LSSi may rue TWC's decision to contract with Targus and not LSSi, nothing in § 251(b)(3) inhibits that free-market choice.

To be sure, the statute *would* prohibit TWC from giving Targus preferential access to TWC's directory assistance database if both Targus and LSSi were LECs (or their qualifying agents) eligible to receive access to that database. But the evidence does not show that that has happened here. It shows that Targus accesses TWC's data, and the database it creates from that data, solely in its capacity as TWC's contracted vendor; that Targus is precluded from using any of TWC's data, or its database, for its own purposes; and that Targus plays the limited role of disseminating TWC's data, on equal terms, to all entities statutorily entitled to access to it. On the evidence presented, there is no basis to find that TWC is furnishing Targus favorable access in violation of § 251(b)(3). *Cf.* Hg. Tr. 101 (LSSi's counsel concedes that an entity does not have a data access right merely "because they're a competitor of Targus").

Third, and finally, while LSSi has repeatedly claimed that TWC is denying it access to its directory assistance database commensurate with the access TWC itself enjoys, the facts refute that claim. As noted, the evidence established that TWC accesses its database by purchasing that access from Targus, on the same terms as such data would be available to any competing LEC (or its qualifying agent) who so requested.

For these reasons, the Court holds that, even if LSSi had shown a clear entitlement under § 251(b)(3) to nondiscriminatory access to TWC's customer listing data, it has failed to show that TWC is making that data available on a discriminatory basis.[34]

### E.    Clear Showing of Discrimination Under 47 U.S.C. § 202(a)

LSSi also brings a claim under 47 U.S.C. § 202(a), which prohibits common carriers from discriminating in, *inter alia,* "charges" or "practices" with regard to a "like communication service," so as to confer an "undue or unreasonable preference or advantage" on one person or entity" and an "undue or unreasonable preference or disadvantage" on another.  LSSi claims that TWC has improperly discriminated with respect to access to its listing data, so as to confer an "unreasonable preference or advantage" on Targus, and impose an "unreasonable prejudice or disadvantage" on LSSi.  47 U.S.C. § 202(a); LSSi Supp. Br. 21–23.  Specifically, LSSi argues that it and Targus "actively compete to sell data to the same customers, including directory assistance providers such as [KGB]," and that TWC has "forced" customers such as KGB to buy

---

[34] LSSi's claims of injury are also largely outside the zone of interests protected by the statute. LSSi and Oldach have asserted that LSSi is injured by its inability to directly access TWC's listing data, as opposed to acquiring it secondhand, because customers who purchase data from LSSi regard data acquired firsthand as more reliable and accurate.  *See, e.g.*, Oldach Decl. ¶¶ 3–13; Hg. Tr. 70, 72 (testifying that LSSi and Targus compete in the market for the sale of data, including to telemarketers).  But § 251(b)(3) is not concerned with competitiveness in the market for data resale; its goal is to promote competition in the provision of telecommunications service. LSSi and Oldach have also asserted that Targus is gaining advantage in the market for selling customer data by touting (and, LSSi suggests, falsely hyping) its agreement with TWC.  *See, e.g.*, Oldach Decl. ¶¶ 16–18 (LSSi and Targus are competitors in various business lines, including in the area of sales to telemarketers); Oldach Dep. 75 ("I get increasing reports from my sales team about the data that Targus has that we don't have.  And that's a constant battle."); *id.* at 124 (Targus competes with LSSi, *inter alia*, in the "enterprise market," which includes sales to telemarketers); Hg. Tr. 36, 39–40, 73; *cf.* Oldach 2d Supp. Decl. Ex. E at LSSI00000025 (internal LSSi e-mail claiming that Targus has spread false rumors about shortcomings in LSSi's database).  Whether or not LSSi might have a cause of action against Targus on account of these alleged business practices, a data vendor's marketing practices are not addressed by § 251(b)(3). Further, Targus is not a LEC, *see* Ainge Decl. ¶ 2; *cf.* Hg. Tr. 37–38, nor a party to this lawsuit. Oldach testified that LSSi has chosen not to sue Targus for its alleged misdeeds, because a lawsuit would be expensive, time-consuming, and difficult.  Hg. Tr. 74.

[62]

TWC's data from Targus "instead of LSSi, at double LSSi's price, expressly because of TargusInfo's exclusive advantage." *Id.* at 21–22.  LSSi's arguments are without merit.

The determination "whether a carrier is discriminating in violation of § 202(a) involves a three-step inquiry: (1) whether the services are 'like'; (2) if they are, whether there is a price difference between them; and (3) if there is, whether that difference is reasonable." *Law Offices of Curtis V. Trinko*, 305 F.3d at 98 (citing *Competitive Telecomm. Ass'n v. FCC*, 998 F.2d 1058, 1061 (D.C. Cir. 1993), and *Nat'l Commc'ns Ass'n*, 238 F.3d at 127 (assuming that this three-step inquiry applies in this Circuit)); *see also Li Xi v. Apple Inc.*, 603 F. Supp. 2d 464, 471 (E.D.N.Y. 2009); *Net2Globe Int'l v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 460 (S.D.N.Y. 2003); *LO/AD Communs., B.V.I., Ltd. v. MCI WorldCom*, No. 00-cv-3594, 2001 U.S. Dist. LEXIS 517, at *16 (S.D.N.Y. Jan. 21, 2001).

As to the first step of the § 202(a) analysis, a plaintiff must identify another market participant which receives the "like" service that the plaintiff wishes to obtain, so as to permit a comparison to be drawn and the claim of unreasonable discrimination to be assessed.  *See Ad Hoc Telecomms. Users Comm. v. FCC*, 680 F.2d 790, 808 (D.C. Cir. 1982) (MacKinnon, J., concurring) ("Congress intended section 202(a) to prohibit common carriers from unjustly or unreasonably discriminating among similarly situated customers in the prices charged for the same or substantially the same package of services."); *Star Direct Telecom, Inc. v. Global Crossing Bandwidth, Inc.*, No. 05-cv-6734, 2010 U.S. Dist. LEXIS 137860, at *22 (W.D.N.Y. Dec. 31, 2010) ("To state a claim for discrimination under Section 202(a) of the Communications Act, a plaintiff must establish that the common carrier provided similar services under different terms or conditions to similarly situated consumers or users of those services"); *Union Tel. Co. v. Qwest Corp.*, No. 02-cv-209, 2004 U.S. Dist. LEXIS 28417, at *42

[63]

(D. Wyo. May 11, 2004) ("Both parties agree that telecommunications carriers are prohibited from unjustly or unreasonably discriminating in the provision of rates, charges, classifications or services. *See, e.g.*, 47 U.S.C. § 202(a) . . . . In essence, similarly situated customers must be treated alike."); *MCI Telecomms., Inc. v. T. A. Commc'ns., Inc.*, 40 F. Supp. 2d 728, 733 (D. Md. 1999) ("Section 202(a) . . . prohibits rate discrimination among similarly situated entities.").[35]

LSSi has failed to clear the first and second steps in the analysis, because the evidence adduced to date has failed to demonstrate that "like" services are being offered to or received by other market participants on differing terms. On the contrary, as discussed above, the evidence establishes that Targus will make TWC's data available, on identical terms, to competing LECs and their qualifying agents that request it.[36] There is, thus, no evidentiary basis to find discrimination, let alone unreasonable discrimination, in the prices or terms on which TWC's directory assistance listings are made available.

Nor may LSSi prevail by changing the subject, so as to allege that *if* LSSi had access to TWC's directory assistance data, and *if* it was permitted to sell that data, it would sell that data to customers like KGB at a lower price than Targus offers it. *See, e.g.*, Hg. Tr. 77–78 (Oldach: LSSi would have liked to sell TWC's data to KGB, and would have charged KGB "less than half

---

[35] In 1999, LSSi urged the FCC to "exercise its authority under Sections 201 and 202 [of the Communications Act] to extend access to DA list information to DA providers that are not eligible under Section 251(b)(3) of the Act." *See* Comments of Listing Services Solutions, Inc. before the Federal Communications Commission, at 1–2, Davis 3d Decl. Ex. A. Although the FCC later issued its 2001 and 2005 orders clarifying rights of access under § 251(b)(3), it does not appear that LSSi's efforts to obtain increased access to such data via § 202 were successful.

[36] TWC has represented that, to date, no entity eligible under § 251(b)(3) to receive TWC's directory assistance data has asked for that data. *See* Loyer Decl. ¶ 12; Hg. Tr 212–13. LSSi has not disputed this point. To the extent LSSi is read to protest price discrimination by Targus among recipients of that data—its briefs were not clear on this point—any such claim is, necessarily, premature, until such time as requests by multiple eligible purchasers are made.

the price Targus was charging").  For the reasons explained, LSSi, notwithstanding its claims of

entitlement, has failed to demonstrate a legal right to TWC's directory assistance data.  It is,

therefore, academic what price LSSi would charge KGB if LSSi had the right to access and sell

TWC's customer assistance data.  It is also irrelevant: § 202(a) is not concerned with whether a

price offered in connection with a "communications" service is reasonable, but whether a

common carrier's *discrimination* in price as among recipients is reasonable.  *AT&T Co. v. New

York City Human Res. Admin.*, 833 F. Supp. 962, 980 (S.D.N.Y. 1993) ("The question [under §

202(a)] is not how much better off the complainant would be today if it had paid a lower rate.

The question is how much worse off it is because others have paid less.") (quoting *I.C.C. v.

United States ex rel. Campbell*, 289 U.S. 385, 390 (1933)).[37]

> **F.    Irreparable Harm, the Balance of Interests, and the Possibility of "Extreme
>         or Very Serious Damage"**

In light of the Court's findings that LSSi has not made a clear showing of likelihood of

success on the merits, the Court need not address the separate preliminary injunction elements of

irreparable harm and the balance of equities.  *Cf. New York v. Locke*, No. 08-cv-2503, 2009 U.S.

Dist. LEXIS 37091, at *56 (E.D.N.Y. Apr. 30, 2009); *Collagenex Pharms., Inc. v. IVAX Corp.*,

375 F. Supp. 2d 120, 140 (E.D.N.Y. 2005); *Novo Nordisk A/S v. Becton Dickinson & Co.*, 997 F.

Supp. 459, 470 n.30 (S.D.N.Y. 1998).

---

[37]  TWC also argues that § 202(a)'s nondiscrimination mandate does not apply to the provision
of directory assistance listing data, because such data is not a "service for or in connection with .
. . communication service" as necessitated by the terms of 47 U.S.C. § 202(a).  TWC Supp. Br.
24–25.  In the 2001 Order, the FCC declined to resolve the question of whether such data is
covered by § 202(a).  *See* 2001 Order, 16 FCC Rcd. 2736, at ¶ 31 ("The Commission also sought
comment on whether sections 201(b) and 202(a) require LECs to offer nondiscriminatory
database access to all competing DA providers.  We conclude that resolution of that question on
this record is premature.").  In addressing LSSi's claim here, the Court has assumed, *arguendo*,
that such data is covered by § 202(a), without resolving that question.

Further, to the extent LSSi claims that an injunction is merited because it would otherwise suffer "extreme or very serious damage," the Court disagrees.  *Cacchillo*, 638 F.3d at 406 (citing *Citigroup Global Mkts., Inc.*, 598 F.3d at 35 n.4); *see supra* p. 16.  For four independent reasons, the Court cannot so find.

First, as demonstrated above, LSSi's claimed injury—a purported competitive harm from being unable to resell information which it has no right to access in the first place—falls outside the zone of interests protected by the Communications Act and the TCA.  Any injury caused by LSSi's inability to resell information which it has no legal right to possess is not legally cognizable.

Second, LSSi's claimed injury is "speculative" rather than "actual and imminent."  *See Faiveley Transp.*, 559 F.3d at 118 (quoting *Grand River Enter. Six Nations, Ltd.*, 481 F.3d at 66).  As of Oldach's deposition in January 2012—16 months after TWC denied LSSi's demand for data—Oldach could not identify a single customer or any business that LSSi had lost as a result of that denial.  *See* Hg. Tr. 41, 44–45.

Third, to the extent that LSSi claims that Targus's statements about TWC's data have been harming LSSi in the market, *see supra* note 34, Targus is not a party to this lawsuit.  That was LSSi's choice:  As Oldach testified at the hearing, "[f]rom my perspective, [suing Targus, in addition to TWC would be] an expensive, time-consuming, and difficult process.  Versus just executing what we view is our right to get the data. We thought that was a much simpler approach."  Hg. Tr. 74:17–21.

Fourth, as noted, LSSi has been aware of TWC's refusal to furnish data to it since September 2010, and yet waited 10 months, until July 2011, to bring this lawsuit.  Such delay betrays LSSi's "own doubts as to the severity of harm at hand."  *Firemen's Ins. Co. of Newark,*

[66]

*N.J. v. Keating*, 753 F. Supp. 1146, 1158 (S.D.N.Y. 1990). LSSi's "failure to act sooner 'undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.'" *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985) (quoting *Le Sportsac, Inc. v. Dockside Research*, Inc., 478 F. Supp. 602, 609 (S.D.N.Y. 1979)). LSSi's delay also calls into question its claim to have suffered serious harm.

## CONCLUSION

For the reasons stated in this Opinion, LSSi's motion for a preliminary injunction compelling TWC to provide LSSi with all directory assistance listing data for TWC's telephone subscribers is denied.

SO ORDERED.

_____
Paul A. Engelmayer
United States District Judge

Dated: May 23, 2012
      New York, New York

[67]